**Otto K. WEITKENAUT**

v.

**GOODYEAR TIRE & RUBBER COMPANY.**

Civ. A. No. 73–108.

United States District Court, D. Vermont.

Sept. 26, 1974.

Paul, Frank & Collins, Burlington, Vt., James J. Barry, Jr., Manchester, N. H., Malloy & Sullivan, Boston, Mass., for plaintiff.

Black & Plante, White River Junction, Vt., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS

HOLDEN, Chief Judge.

The complaint charges that the plaintiff, Otto K. Weitkenaut, has been the victim of an unlawful employment practice at the instance of the defendant, Goodyear. The plaintiff alleges discrimination for reasons of religion, in violation of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 (42 U.S.C. § 2000e et seq.). The charge was referred to the Equal Employment Opportunity Commission. The Commission (EEOC) has determined there is reasonable cause to believe the charge that religion was a factor in the plaintiff's discharge by the defendant employer. The present proceedings were instituted within 90 days thereafter, as provided in 42 U.S.C. § 2000e–5(f)(1), seeking declaratory and injunctive relief, together with an award of accrued wages and attorney's fees. After continuance at the plaintiff's request, with the assent of the defendant, the cause was tried by the court. The court finds the facts which follow.

## FINDINGS

The plaintiff is an ordained minister of the New Apostolic Church of North America. While serving the church in a deaconate in 1967, he was assigned to Claremont, New Hampshire from Schenectady, New York. The assignment was for the purpose of organizing and establishing a church at the new location. His pastoral duties were, and presently are, performed without compensation, hence he applied for employment with Goodyear at its plant at Windsor, Vermont on August 17, 1967. He was informed by the personnel office during his employment interview that the only vacancy that existed at that time was in the second shift from 3:00 to 11:00 P.M. Since employment on the second shift would conflict with his attendance at certain monthly meetings of the church leaders outside Vermont, later referred to, he declined this job opportunity. Later in the year he was notified that a vacancy existed in the third shift, which operated from 11:00 P.M. to 7:00 A.M. He accepted the employment and began work on December 4, 1967. The plaintiff was informed that the company could not guarantee employment on any particular shift.

During the time of his employment by Goodyear at Windsor the plaintiff organized and established a branch of the New Apostolic Church in Claremont, New Hampshire. He became an ordained minister of the church on October 6, 1968. The Claremont church has fifty-two members in regular attendance. The national church has 40,000 members and is a religious sect of Christian denomination. The day designated for observance of the Sabbath is Sunday. As a minister of the church,

the plaintiff considered it to be his duty to attend the meetings of the church leaders one Friday evening each and every month. The meetings were first held at Bayside, New York, and later at Clifton, New Jersey. They were convened at these locations by the apostolic leader of the New Apostolic Church. The meetings were accompanied by religious ceremonies. The primary purpose of the monthly meetings, however, has been to attend to the administrative affairs of the church organization, to coordinate the activities and objectives of the church and to enable the ministers of the church to better perform their clerical and religious educational duties. The agenda included consideration of the rules and regulations of the church and its business and financial affairs. In the plaintiff's view, and that of his religious superiors, attendance, while voluntary, was essential and mandatory to his competent fulfillment of his ecclesiastical obligations.

Until December, 1968, Goodyear's third shift was composed of ninety employees. The plaintiff's work week started Sunday evenings at 11:00 P.M. This schedule presented no serious interference with the plaintiff's function as a cleric of his church. However, at the end of 1968 the shifts were rearranged and the start-up time changed from Sunday at 11:00 P.M. to Monday. The plaintiff's assignment to the second shift prevented his attendance on one Friday each month at the church meetings at Bayside. The plaintiff discussed his problem with his foreman-supervisor. He requested permission to be excused one Friday each month to attend the monthly church meeting and to charge his absence to vacation time. The plaintiff then requested permission to supply a replacement operator on the Foster-Wucher machine, to which he had been assigned. Although operation of this machine required no special skill, and replacements were readily available and willing to substitute for him, the request was denied. The plaintiff tried to get a change in work shifts to no avail. The conflict between the plaintiff's work schedule and the monthly religious meetings on Friday caused the plaintiff to be absent from work on seven occasions in 1969.[1] In June, 1969 the Goodyear management confronted the plaintiff with the blunt choice—"your church or your job." On June 20, 1969 the plaintiff was absent from work to attend a monthly ministerial meeting. The plaintiff was discharged by the defendant when he reported for duty the following week. While in the employ of the defendant, the plaintiff has been a competent and well qualified workman.

The plaintiff's termination became the subject of a grievance procedure instituted by the president of Local 289, A. F.L.–C.I.O. United Rubber, Cork Linoleum and Plastic Workers of America. The grievance presented by the Union was not sustained. However, the arbitrator recommended that the plaintiff be given an opportunity to return to work to enable the parties to explore the possibilities of accommodating the conflict between the work schedule and church meetings. The defendant acceded to this recommendation. The plaintiff returned to work in March 1970. He was assigned to the first work shift. During 1970 the monthly meetings of the New Apostolic Church were changed from Friday to Saturday. The scheduling conflicts have been adjusted to the

---

1. Goodyear records indicate plaintiff was absent seven times in 1968; of these, three were excused, three involved a "report off" —(company notified that worker could not report for work) and one absence was unexplained. In 1969 plaintiff was absent seven times:

  January 16 (Friday)—reported "off";
  February 19th (Wednesday)—reported "off";

  March 28th (Friday)—reported he was sick on Monday, March 31st.
  April 18th (Friday)—reported "off";
  May 16th (Friday)—reported "off" (brought in a signed statement by W. B. Ferritter, M.D., saying he could not work on May 16th). Plaintiff suffering from bursitis, but he did attend the meeting at Bayside.
  June 20th (Friday).

apparent satisfaction of both parties. Since then the plaintiff's absence from work has caused no concern to either the plaintiff or Goodyear.

At the time of the plaintiff's termination on June 23, 1969, his weekly earnings for a normal period of work were $125. During the period January 1, 1969 through June 20, 1969, the plaintiff earned and received $4,077.87. From March, 1970, when the plaintiff returned to Goodyear, through December 31, 1970, the plaintiff earned $5,398.70. Had his regular employment continued to March, 1970, when he was restored to the Goodyear payroll, his earnings would have been approximately $4,736. During the period June 23, 1969, to March, 1970, the plaintiff's earnings from temporary employment were $2,963.55. As a direct result of the defendant's termination of the plaintiff's employment on June 23, 1969, the plaintiff sustained a loss of earnings in the amount of $1,772.45.

The Goodyear Company had followed a policy of excusing its employees to attend religious ceremonies on days when the observance of the Sabbath in a particular religion came during working hours. In keeping with this policy, the Goodyear plant at Windsor adjusted the working schedule of three of its employees who observed the Sabbath from sundown on Friday to sundown on Saturday to avoid a conflict between their employment and the observance of a particular day of worship. These adjustments were made by the defendant, without any hardship on Goodyear, either by way of increased expense or detrimental effect on production. At plant locations other than Windsor, employees who served as ministers of a religious organization have been afforded excused absences to enable them to participate in

religious ceremonies and perform various pastoral obligations.[2]

The Goodyear Company prefers that its employees take their earned vacation over weekly periods, rather than a day at a time. There is no inflexible rule or policy to enforce this preference. Employees are frequently allowed excused absences for shorter periods of time to suit their personal convenience for recreation and other reasons.

The Court finds the defendant made no effort to accommodate the needs of the plaintiff's ministry in the New Apostolic Church of North America. Such accommodation could have been achieved without undue hardship or expense to the defendant.

## CONCLUSIONS

Since 1964 it has been—"an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1); Pub.L. 88–352, Title VII § 703.

■ The controlling, and apparently new question presented by this case is whether "religion" as used in this statute includes the duties of one engaged in the ministry of a particular faith. The Civil Rights Act of 1964, as first written, afforded no specific definition of religion.

In July, 1967 the Equal Employment Opportunity Commission, pursuant to 42 U.S.C. § 2000e–12, issued an administrative guideline on religious discrimination concerning "Observation of the Sabbath and other religious holidays," 29 CFR, Sec. 1605.1.[3] While the guideline

2. Pltf. 4—Letter to employees who are ministers. Pltf. 5.

3. That guideline did not purport to limit the scope of religious protection to Sabbath observing employees, rather it dealt with the Sabbath observance issue because "Several

complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or

did not cover the particular question presented here, the Commission found that "the duty not to discriminate on religious grounds . . . includes an obligation on the part of an employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business." 29 CFR, Sec. 1605.1(b) (1967).

The Equal Employment Act of 1972 went somewhat further to provide a definition of "religion" by adding Pub.L. 92–261, § 2(7):

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

The employer's duty of reasonable accommodation, and the assignment to the employer of the burden of proving undue hardship are derived from the guideline.[4] The guideline has been held to express the prior intention of Congress in enacting the Civil Rights Act of 1964. Riley v. Bendix Corp., 464 F.2d 1113 (5th Cir. 1972); Reid v. Memphis Publishing Co., 468 F.2d 346, 351 (6th Cir. 1972). The Court affords substantial weight to the 1972 Amendment defining "religion," and finds it to be declarative of Congress' intent as to the meaning of the word "religion" in the 1964 Civil Rights Act. See e. g., Erlenbaugh v. United States, 409 U.S. 239, 243, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972).[5] Senator Randolph, who sponsored the 1972 Amendment, commented that: "This amendment is intended, in good purpose, to resolve by legislation . . . and in a way I think was originally intended by the Civil Rights Act . . . that which the courts apparently have not resolved." 118 Cong.Rec. § 228 (1972).[6] Since the 1972 definition of "religion" is declarative of Congress' intent in 1964, it is applicable to the employer practice of June, 1969 here at issue.

The next question is whether the definition of "religion" includes the duties of one engaged in the ministry of a particular faith. The defendant contends that the scope of Title VII religious protection is limited to practices of members of a church—that functions of the ministry are not included.

The express language of the statute, particularly the inclusion of "all aspects

---

who observe certain special religious holidays during the year and, as a consequence, do not work on such days." 29 CFR, Sec. 1605.1(a) (1967).

4. See Reid v. Memphis Publishing Co., 468 F.2d 346, 350–351 (6th Cir. 1972). 29 CFR, Sec. 1605.1(c) (1967) provides: "Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable."

5. . . . [A] legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a "later act can . . . be regarded as a legislative interpretation of (an) earlier act . . . in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting," and "is therefore entitled to great weight in resolving any ambiguities and doubts." Erlenbaugh v. United States, 409 U.S. 239, 243–244, 93 S. Ct. 477, 480, 34 L.Ed.2d 446 (1972), quoting United States v. Stewart, 311 U.S. 60, 64–65 (1940).

6. Judge Tuttle points out in Riley v. Bendix Corporation, *supra*, at pp. 1116–1117, that the impetus for the 1972 amendment, Section 2000e(j), was Dewey v. Reynolds Metal Co., 429 F.2d 324 (6th Cir. 1970), sustained by an equally divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). Dewey upheld an employer's discharge of his employee for refusing to work on Sunday. The amendment was an effort to resolve an issue left open by the courts and was a legislative response to the holding itself, and should not be construed as limited to protection of Sabbath observance only. See generally 119 Cong.Rec. § 228 (1972).

of religious . . . practice," indicates that Congress did not intend to limit its definition of religion to the observance and practices of church members to the exclusion of those charged with pastoral responsibilities. This seems to be borne out by Senator Randolph's statement: "I think in the Civil Rights Act we thus intended to protect the same rights in private employment as the Constitution protects in Federal, State or local governments." Id.

The constitutional protection against governmental intrusion is found in the First Amendment, which forbids Congress from making any law respecting establishment of religion or prohibiting the free exercise thereof. The United States Supreme Court has extended First Amendment protection to members of the ministry in equal proportion to that enjoyed by members of their congregation. Follett v. McCormick, 321 U.S. 573, 576–577, 64 S.Ct. 717, 719, 88 L.Ed. 938 (1944). In holding a local license tax to be violative of freedom of worship as applied to an evangelist, the Supreme Court by Justice Douglas stated: "Whether needy or affluent, [preachers] avail themselves of the constitutional privilege of a 'free exercise' of their religion when they enter the pulpit to proclaim their faith. The priest or preacher is as fully protected in his function as the parishioners are in their worship." Id. Cf. Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); and see also Fowler v. Rhode Island, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953), where the Court observed that "(s)ermons are as much a part of a religious service as prayers."

Since Congress intended to protect the same rights in private employment that the Constitution protects in the governmental domain, it safeguards the clergyman's right to minister to the congregation as well as the church member's right to worship. When Congress protected "all aspects" of religious practice it protected ministry practice as well. The plaintiff attended the monthly meetings to prepare for his pastoral duties. This preparation was essential to his ability to lead his congregation. The Court is persuaded that the plaintiff's absence for one evening a month to advance the organization, discipline and teaching of his church, constituted a protected aspect of religious practice within the meaning of Title VII.

To be sure, the enactment does not confer on either the church member or minister of an organized religion the absolute privilege to disregard his employment obligations for the sake of his religion.[7] It does require employer accommodation where no undue hardship would result to the employer's business. Absent any genuine hardship to Goodyear, the defendant's termination of the plaintiff's employment on June 23, 1969, without reasonable effort to accommodate the plaintiff's religious commitment, constituted an unlawful employment practice within the proscription of 42 U.S.C. § 2000e–2(a)(1).

Since it appears that Goodyear readily adopted the arbitrator's recommendation that the plaintiff be granted an opportunity to return to work and did, in good faith, find accommodation for the conflict in the competing interests of the parties, the Court concludes there is no just cause for assessing attorney's fees against the defendant. The Court holds that the plaintiff is entitled to recover his loss of earnings during the period of his termination in the amount of $1,772.45, with interest at 7½% from June 23, 1969, together with his taxable costs. Judgment will be entered accordingly.

---

7. In Johnson v. United States Postal Service, 364 F.Supp. 37 (N.D.Fla.1973) the court held that discharge of a part-time postal clerk for observance of a Saturday Sabbath was justified because the employer demonstrated an inability to reasonably accommodate the employee without undue hardship to the business. A senior postal clerk would have had to perform the work of a non-senior part-time clerk.