# United States Court of Appeals
## For the First Circuit

No. 16-1589

IRONSHORE SPECIALTY INSURANCE COMPANY,
in its own right and as subrogee of NORTHEAST SHIP REPAIR, INC.,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA; AMERICAN OVERSEAS MARINE COMPANY, LLC,

Defendants, Appellees,

GENERAL DYNAMICS AMERICA OVERSEAS MARINE CORPORATION,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Barron, Stahl, and Lipez,
Circuit Judges.

George M. Chalos, with whom Chalos & Co, P.C. was on brief,
for appellant.
Anne Murphy, Attorney, Civil Division, U.S. Department of
Justice, with whom Benjamin C. Mizer, Principal Deputy Assistant
Attorney General, Carmen Milargros Ortiz, United States Attorney,
and Matthew M. Collette, Attorney, Civil Division, U.S. Department
of Justice, was on brief, for appellee United States of America.
Thomas J. Muzyka, with whom Olaf Aprans and Clinton & Muzyka,
P.C. were on brief, for appellee American Overseas Marine
Corporation.

September 15, 2017

**LIPEZ**, **Circuit Judge**.  This appeal arises out of an incident on the South Boston Waterfront, where a large military transport vessel, the FISHER, unexpectedly spilled over 11,000 gallons of fuel next to Boston Harbor.  Ironshore Specialty Insurance Company ("Ironshore"), the entity that paid the clean-up costs, appeals from a district court order dismissing claims it brought against American Overseas Marine Company, LLC ("AMSEA") and the United States under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701-2761, general admiralty and maritime law.  After carefully considering the parties' arguments and the relevant law, we affirm in part and reverse in part.

## I.

The FISHER is a large, medium speed, "roll on, roll off" transport vessel and vehicle cargo ship.  The Military Sealift Command, a division of the United States Navy, owns the FISHER.  The vessel is deployed principally to carry military vehicles and containerized cargo for the Department of Defense.

In 2010, the Military Sealift Command entered into a contract with AMSEA, in which AMSEA agreed to crew, maintain, and make routine repairs to the FISHER.  In June 2014, pursuant to that contract, the FISHER entered a Boston graving dock owned by Boston Ship Repair ("BSR"), with whom AMSEA had subcontracted to

perform routine maintenance.[1] No aspect of the maintenance related to fueling the FISHER, and only AMSEA crew members were permitted to conduct fuel transfers. On July 9, while the FISHER was propped up on blocks within the graving dock, an oil spill occurred as a result of the allegedly negligent conduct of AMSEA crew members. More than 11,000 gallons of diesel fuel poured out of the vessel and into the graving dock. To prevent the fuel from escaping into Boston Harbor -- and to minimize damages to the FISHER and BSR's graving dock -- BSR quickly acted to contain and remove the fuel.

BSR incurred nearly $3,000,000 in costs associated with cleaning up the FISHER's fuel spill, which Ironshore reimbursed as BSR's pollution policy insurer. As BSR's subrogee, Ironshore filed this action in the United States District Court for the District of Massachusetts against AMSEA and the United States to recover the money it paid to reimburse BSR's cleanup costs. Ironshore's three-count complaint sought (1) cleanup costs and damages under the OPA; (2) a declaratory judgment finding AMSEA and the United States to be strictly liable parties under the OPA; and (3) damages sounding in general admiralty and maritime law as a result of AMSEA's and the United States' alleged negligence.

---

[1] A "graving dock" is "a permanent structure on land with gates that allow vessels to enter and that then can be closed to drain out the water. In other words, it is a drydock." Vasquez v. GMD Shipyard Corp., 582 F.3d 293, 298 (2d Cir. 2009) (quoting San Francisco Drydock, Inc. v. Dalton, 131 F.3d 776, 777 (9th Cir. 1997)).

The United States and AMSEA each filed a motion to dismiss Ironshore's OPA claims under Federal Rule of Civil Procedure 12(b)(6).  AMSEA also asked the district court to dismiss Ironshore's negligence claims against it.  The district court granted both parties' motions to dismiss in full.  The district court went further, however, and also dismissed sua sponte Ironshore's negligence claim against the United States, concluding that the OPA foreclosed the option of bringing any negligence claim relating to oil spills under general admiralty and maritime law. Ironshore timely appealed, asserting that (1) the district court inappropriately considered documents outside the pleadings when it decided the defendants' motions to dismiss; and (2) it erroneously dismissed each of Ironshore's OPA and negligence claims.

## II.

We review a district court's grant of dismissal under Rule 12(b)(6) de novo, treating as true all well-pleaded facts in the complaint.  Isla Nena Air Servs., Inc. v. Cessna Aircraft Co., 449 F.3d 85, 87 (1st Cir. 2006).

### A. Documents Outside the Pleadings

Ironshore argues that, as a threshold matter, the district court committed reversible error when it relied upon materials outside the pleadings in granting AMSEA's and the United States' 12(b)(6) motions to dismiss.  Specifically, Ironshore challenges the district court's decision to consider the Military

Sealift Command's contract with AMSEA. Ironshore did not include or append this contract to its complaint. Rather, AMSEA and the United States provided excerpts of the contract to the district court alongside their respective motions to dismiss, and the United States appended the full contract to its reply to Ironshore's opposition to its motion to dismiss.[2] Ironshore asserts that, by relying on the contract in its disposition of the defendants' motions, the district court inappropriately converted the Rule 12(b)(6) motions to dismiss into Rule 56 summary judgment motions that "could not be properly resolved until the completion of discovery." We disagree.[3]

"Ordinarily[] . . . any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). We have recognized, however, that when

---

[2] AMSEA also submitted a number of other documents outside the pleadings along with its motion to dismiss, but the district court only relied upon one document outside the pleadings -- the contract between the Military Sealift Command and AMSEA -- in its memorandum of decision.

[3] Ironshore has also argued that even if it may have been appropriate to convert the defendants' Rule 12(b)(6) motions to dismiss into Rule 56 motions for summary judgment, the district court failed to provide Ironshore reasonable opportunity to present any additional material pertinent to such a summary judgment motion as required under Rule 12(d). Because we find no such conversion occurred, we need not address this grievance.

considering 12(b)(6) motions to dismiss, "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  Id.  Moreover, "[u]nder First Circuit precedent, when 'a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss."  Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005) (alteration in original) (quoting Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 34 (1st Cir. 2001)).

Although Ironshore's complaint does not explicitly reference the contract between the Military Sealift Command and AMSEA or the relationship between the two parties, the complaint alleges that the United States was the owner of the FISHER and that AMSEA was "[a]t all times material [to the dispute] the operator" of the FISHER.  It further alleges that AMSEA and the United States are "responsible parties," subject to strict liability under the OPA.  Because the OPA indisputably exempts public vessels from liability, 33 U.S.C. § 2702(c)(2), Ironshore's OPA claims hinge upon the question of whether the FISHER qualifies as a public vessel.  That question, in turn, requires an examination of the contractual relationship between the Military

Sealift Command and AMSEA.  Ironshore has not preserved any challenge to the authenticity of the contract, and, as we explain below, the contract answers the determinative OPA question.[4] Hence, the district court did not commit a reversible error by considering the contract between AMSEA and the Military Sealift Command when it decided the defendants' motions to dismiss.

## B. Oil Pollution Act Claims

In 1989, the oil tanker Exxon Valdez ran aground in the Prince William Sound on the Alaska coast, causing the largest oil spill at that point in U.S. history.  Congress enacted the OPA in response.[5]  See Metlife Capital Corp. v. M/V EMILY S., 132 F.3d 818, 820 (1st Cir. 1997).  Before passage of the OPA, the Clean Water Act "provided liability limitations for federal pollution removal costs associated with oil spills."  Id.  The OPA altered the Clean Water Act framework by "impos[ing] strict liability for pollution removal costs and damages on the 'responsible party' for

---

[4] In the district court, Ironshore urged the court to exclude the contract from consideration when ruling on the motions to dismiss, noting that the motions included only excerpts of the contract and that Ironshore -- a nonparty -- had never seen the entire document.  After the government subsequently provided the full document, Ironshore did not challenge the full document either by seeking leave to file a written objection or at the hearing on the motions to dismiss.  In these circumstances, we deem waived any challenge to the contract's authenticity.

[5] Although we refer to the OPA's rules regarding "oil spills," the statute applies equally to diesel fuel spills, such as the spill occurring on the FISHER.  33 U.S.C. § 2701(23).

a vessel . . . from which oil is discharged." Id. at 820-21 (citing 33 U.S.C. § 2702(a)). In turn, the OPA limits the total dollar amount for which a responsible party can be held liable, so long as that party has not committed acts of gross negligence or willful misconduct. Id. at 821. Finally, the statute "consolidated previously established oil pollution funds into the Oil Spill Liability Trust Fund[,] . . . which pays claims brought under the OPA after they have first been presented to the responsible party, if the responsible party is entitled to a defense, or the liability limit under the statute has been reached." Id.

In the context of oil spills occurring from a ship, the OPA defines a "responsible party," in part, as "any person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A). But there is a caveat. The OPA explicitly states that the statute "does not apply to any discharge . . . from a public vessel." Id. at § 2702(c)(2). Furthermore, in spelling out which vessels fall under the purview of the OPA, the statute defines the term "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, other than a public vessel." Id. at §2701(37) (emphasis added). The statute defines a "public vessel" as "a vessel owned or bareboat chartered and operated by

the United States[] . . . except when the vessel is engaged in commerce."  Id. at § 2701(29).

Ironshore seeks to recover costs that it incurred when it reimbursed its insured, BSR, for cleaning up the diesel spill. All parties agree that the OPA applies to diesel spills occurring in graving docks such as the one owned by BSR, and no party argues that the FISHER was engaged in commerce when it discharged its fuel.  AMSEA and the United States both assert that the FISHER is exempt from the OPA because it was both owned and operated by the United States at the time of the spill and, hence, qualifies as a public vessel under the act.  Ironshore responds that while the United States was the owner of the FISHER at the time of the spill, AMSEA was its sole operator.  Because AMSEA crew operated the ship rather than government employees, Ironshore argues, the FISHER does not qualify as a "public vessel" under the OPA, and Ironshore can recover from both parties under the statute.

Although the OPA states that vessels "owned and . . . operated by the United States" are public vessels, the statute provides no definition of the word "operated."  Nor are we aware of any federal court, aside from the district court in this case, that has been required to interpret the precise definition of "public vessel" under the OPA.  But the OPA is not the only federal statute that employs the term "public vessel."  Congress enacted the Public Vessels Act in 1925, waiving the United States'

sovereign immunity and allowing parties to sue the government for damages arising from the negligent operation of public vessels. See Canadian Aviator, Ltd. v. United States, 324 U.S. 215, 218-19 (1945). Unlike the OPA, the Public Vessels Act has provided a substantial body of case law interpreting the term "public vessels."

In 1966, the Third Circuit faced an analogous set of facts to those we face here in the case of In re United States, 367 F.2d 505 (3d Cir. 1966). There, the court had to decide whether a military transport tanker owned by the U.S. Navy's Military Sea Transportation Service and crewed by a private contractor constituted a "public vessel" under the Public Vessels Act. Id. at 507-08. The Third Circuit did not consider it a difficult question, stating, "we would have thought it too clear for serious argument that a ship owned by the United States and used as directed by the Navy for the transportation of military supplies is 'a public vessel of the United States.'" Id. at 509. The court flatly rejected claimants' argument that only ships crewed by public employees constitute "public vessels" under the Public Vessels Act, concluding that "government ownership and use as directed by the government exclusively for a public purpose suffice without more to make a ship a public vessel." Id. (citing Smith v. United States, 346 F.2d 449, 454 (4th Cir. 1965)).

- 11 -

Likewise, the Second Circuit held in 1985 that a government-chartered vessel operated by a private contractor constituted a "public vessel" under the Public Vessels Act because "Congress understood the term 'public vessel' in the [Public Vessels Act] to include a vessel . . . used solely in public service." Blanco v. United States, 775 F.2d 53, 59 (2d Cir. 1985). Courts have continued to apply the same meaning to "public vessels" under the Public Vessels Act since the passage of the OPA. See, e.g., Taghadomi v. United States, 401 F.3d 1080, 1083 n.3 (9th Cir. 2005); Favorite v. Marine Pers. & Provisioning, Inc., 955 F.2d 382, 385 (5th Cir. 1992).

It is a familiar principle of statutory construction that "[s]tatutes which relate to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope." United States v. Gray, 780 F.3d 458, 467 (1st Cir. 2015) (quoting Rathbun v. Autozone, Inc., 361 F.3d 62, 68 (1st Cir. 2004)). Moreover, the canon of in pari materia advises that Congress generally intends specific words to carry consistent meaning when used in the same context. Erlenbaugh v. United States, 409 U.S. 239, 243 (1972). When Congress opted to exempt "public vessels" from OPA liability, it did so against a backdrop of federal law that had consistently interpreted the term "public vessels" to include government owned ships crewed by private contractors acting on

- 12 -

behalf of the government. We harbor no doubt that Congress intended the OPA term "public vessels" to be interpreted in the same manner as "public vessels" under the Public Vessels Act. In the context of the OPA, we therefore adopt the sound consensus of our sister circuits, holding that if a vessel functioning in a public capacity is owned (or bareboat chartered) by the United States, but crewed by a private contractor, such a vessel constitutes a "public vessel" so long as the private contractor is acting under the operational control of the United States and except when the vessel is engaged in commerce.[6] See In re United States, 775 F.2d at 53 ("[G]overnment ownership and use as directed

---

[6] Ironshore insists that the term "public vessel" should be interpreted more narrowly under the OPA than its interpretation under the Public Vessels Act because the OPA is a "strict liability statute," while the Public Vessels Act requires a higher burden of proof associated with standard negligence. Ironshore, however, points to no authority -- and we can find none -- for its alternative interpretation. Instead, relevant legislative history indicates that Congress intended for the term "public vessel" to sweep quite broadly. In its final report on the OPA, the House Committee on Merchant Marine and Fisheries -- the committee with principal jurisdiction over the bill -- noted that a "'Public Vessel' is a subclass of vessel that performs governmental functions for federal, state, or local units of government." H.R. Rep. No. 101-242, pt. 2, at 54 (1989). The only carve-out that the committee report envisioned was for government-owned vessels engaging in "commercial service," which the report defined as "all types of trade or business involving the transportation of goods or persons but exclud[ing] those vessels performing service as combatant-vessels." Id. This carve-out for government owned vessels "engaged in commerce" also appears in the enacted statute. See 33 U.S.C. § 2701(29).

by the government exclusively for a public purpose suffice without more to make a ship a public vessel.").

Applying this principle to the FISHER gives us little pause. Although AMSEA agreed in its contract with the Military Sealift Command to "provide personnel, operational and technical support ashore and afloat, equipment, tools, provisions, and supplies to operate, maintain, and repair the [FISHER]," the contract clearly established that at all times the FISHER would be controlled by the U.S. military. A section of the contract titled "Operational Control" stipulated that the vessel would "operate in the worldwide service under the ultimate operational control" of one of five military commands.[7] Moreover, a separate section stated that the "Military Sealift Command Headquarters" would exercise "Administrative Control" of the ship.

As part of its day-to-day operations, AMSEA was "responsible for performing scheduled and unscheduled maintenance and repairs, as necessary, on a 24 hour a day basis." It held authority to subcontract for certain maintenance and repair work outside its own crew's capabilities, though any subcontract exceeding $100,000 -- and any changes altering a subcontract by

---

[7] These commands, specifically, were the United States Fleet Forces Command, the United States Transportation Command, the Commander of the United States Pacific Fleet, the Commander of the United States Naval Forces Europe-Africa, and the Commander of the United States Naval Forces Central Command.

more than $50,000 -- had to be approved in advance by the government. Furthermore, AMSEA was required to incorporate specific provisions into any subcontract it executed, including the subcontract to use BSR's graving dock. Finally, at all times AMSEA's civilian "Master" of the ship was under an obligation to follow both a Navy standard operating manual and any additional definitive instructions from the United States Navy.

The strict hierarchical relationship between the Military Sealift Command and AMSEA establishes, as the district court concluded, that AMSEA crewed the FISHER under the operational control of the United States. AMSEA did not lease the FISHER from the United States, nor was it permitted to use the vessel for its private gain. Rather, all of AMSEA's work on the FISHER benefited the Military Sealift Command and the United States directly. Under the OPA, the United States both owned and operated the FISHER.

Because the FISHER is a military vessel owned and operated by the United States, it qualifies as a public vessel under the OPA. 33 U.S.C. § 2701(29). As such, it is exempt from OPA liability. Id. at § 2702(c)(2). Hence, the district court properly dismissed Ironshore's OPA claims against the United States and AMSEA.

**C. Negligence Claims**

Ironshore's remaining claims sound in negligence against the United States and AMSEA under general admiralty and maritime law. We address each party in turn.

**1. Claims against the United States**

The district court dismissed all of Ironshore's remaining negligence claims brought under general maritime and admiralty law, concluding that the OPA supplants and preempts all such claims. For this principle, the district court quoted our decision in South Port Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58 (1st Cir. 2000), where we noted that "Congress intended the enactment of the OPA to supplant the existing general admiralty and maritime law." Id. at 65. However, the district court interpreted the holding of South Port Marine too broadly.

In South Port Marine, a private marina filed suit under the OPA against a petroleum company to recover damages incurred after an oil spill allegedly caused by the petroleum company's employee. Id. at 60-61. The district court determined that punitive damages were unavailable under the OPA. Id. at 61. We affirmed the district court, concluding that when Congress supplanted general admiralty and maritime law by passing the OPA -- a statute that provides no punitive damages -- it sought to eliminate punitive damages entirely in any case where OPA liability applied. Id. at 65-66.

Although we acknowledged in South Port Marine that the OPA supplants general admiralty and maritime law when the OPA is triggered, we said nothing about the statute's effect on general admiralty and maritime law outside the OPA context.  Put simply, South Port Marine was silent regarding the OPA's effect on the ability of parties to sue for negligence under general admiralty and maritime law when a public vessel is the genesis of an oil spill.

Fortunately, the statute itself is not silent.  In a subsection of its savings provision titled "Admiralty and Maritime Law," the OPA states:  "Except as otherwise provided in this Act, this Act does not affect . . . admiralty and maritime law."  33 U.S.C. § 2751(e).  Hence, because public vessels lie outside the sweep of OPA liability, any preexisting admiralty and maritime law that applied to public vessels before the OPA's passage survives its enactment.  The district court erroneously dismissed Ironshore's negligence claims against the United States when it did so sua sponte.

The United States argued in its brief that even though Ironshore's general admiralty and maritime negligence claims against the United States are not foreclosed by the OPA, Ironshore has either abandoned or waived those claims because it alluded only to Massachusetts state law claims in its opposition to AMSEA's motion to dismiss.  This argument is misguided.  In responding to

pretrial motions, Ironshore never had to assert its general admiralty and maritime law claims against the United States, because the United States had not moved to dismiss them. Rather, as noted above, the district court dismissed those claims sua sponte. Ironshore has since vigorously asserted its general admiralty and maritime claims against the United States in its briefing before us. We do not view those claims as abandoned or waived.

**2. Claims against AMSEA**

Because we are reinstating Ironshore's negligence claims against the United States, its claims against AMSEA, cannot survive. In order to explain this conclusion, we must briefly address the principle of sovereign immunity.

The United States, as sovereign, cannot be subject to a suit unless it waives its sovereign immunity. See Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 253 (1st Cir. 2003). The provisions of such a waiver define its scope. Id. Ironshore has filed its negligence claims against the United States pursuant to the Suits in Admiralty Act, which includes an explicit sovereign immunity waiver for certain admiralty and maritime claims.[8] But

_____

[8] Under the Suits in Admiralty Act the United States waives its sovereign immunity "[i]n a case in which, if a vessel were privately owned or operated . . . a civil action in admiralty could be maintained." 46 U.S.C. § 30903(a); see also Thames Shipyard & Repair Co., 350 F.3d at 253.

- 18 -

the strings attached to this sovereign immunity waiver prove fatal to Ironshore's negligence claims against AMSEA.

The Suits in Admiralty Act states that "[i]f a remedy is provided by this chapter, it shall be exclusive of any other action arising out of the same subject matter against the . . . agent of the United States . . . whose act or omission gave rise to the claim."  46 U.S.C. § 30904 (emphasis added); see also Ali v. Rogers, 780 F.3d 1229, 1233 (9th Cir. 2015).  Ironshore argues that AMSEA should not be considered an agent of the United States for purposes of the Suits in Admiralty Act's exclusivity provision because record evidence indicates it was "acting entirely on its own behalf."

This argument is misguided.  In cases filed pursuant to the Public Vessels Act, other circuits have held that a private contractor crewing a ship that qualifies as a public vessel is necessarily an "agent of the United States" for purposes of the Suits in Admiralty Act's exclusivity provision.  See Favorite Marine v. Marine Pers. & Provisioning, Inc., 955 F.2d 382, 388 (5th Cir. 1992) ("As a matter of legal definition, 'agent' of the United States is an appropriate characterization of such a contract operator of a public vessel." (quoting In re United States, 367 F.2d 505, 509-10 (3d Cir. 1966)); see also id. ("[T]he general statement of an agency concept . . . include[s] any instrumentality through and by which the public vessels are operated." (quoting In

re United States, 367 F.2d at 510) (second alteration in original)). Having already decided that the concept of a "public vessel" has the same meaning under the OPA and the Public Vessels Act (see supra Section II.B.), we conclude that contractors crewing a ship deemed a "public vessel" for purposes of the OPA are -- as a matter of legal definition -- agents of the United States for purposes of the Suits in Admiralty Act's exclusivity provision. Hence, AMSEA crewed the FISHER as an agent of the United States. As such, the Suits in Admiralty Act's exclusivity provision prevents Ironshore from advancing any claims against it.

## III.

We affirm the district court's dismissal of Ironshore's OPA claims against the United States, but we reverse the district court's dismissal of Ironshore's general admiralty and maritime negligence claims brought against the United States pursuant to the Suits in Admiralty Act and remand those claims to the district court for further proceedings consistent with this opinion. We affirm the district court's dismissal of all of Ironshore's claims against AMSEA. Each party shall bear its own costs.

**So ordered.**