**UNITED STATES of America,**

v.

**Anthony VARBARO, Defendant.**

**No. 84 Cr. 656–CSH.**

United States District Court,
S.D. New York.

Nov. 13, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., New York City, for the U.S.; Kenneth I. Schacter, Asst. U.S. Atty., New York City, of counsel.

Aronwald & Pykett, New York City, for defendant; William I. Aronwald, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In a two-count indictment filed September 7, 1984, defendant, a Westchester County electrical contractor, is charged with bribery of a Staten Island municipal electrical inspector. The indictment charges violations of the Interstate Travel in Aid of Racketeering statute ("the Travel Act"), 18 U.S.C. § 1952, which makes it a crime to use "any facility in interstate ... commerce ... to promote ... any unlawful activity," and the Mail Fraud statute, 18 U.S.C. § 1341. Defendant moves to dismiss the indictment as a whole and the two counts individually and for an order directing the filing of a bill of particulars and the taking of a pretrial deposition of a key witness.

### I.

The ground for dismissal of Count One, charged under the Travel Act, is simply stated: defendant contends that any mailings made in connection with his alleged

activities moved within New York State only and that a Travel Act violation cannot be premised upon intrastate mailings.[1] Although the indictment does not specify the origin and destination of the predicate mailings, the Government does not contest that it bases its prosecution only upon intrastate mailings. Instead it argues that the Travel Act applies to any use of the mails. No appellate case is cited on this point of statutory construction.[2]

The language of the Travel Act, the requisite starting point for the interpretation of its provisions, arguably supports either position. The Act subjects to criminal penalty anyone who "travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to ... (3) ... promote, manage, establish, [or] carry on ... any unlawful activity." 18 U.S.C. § 1952(a). Section 1952(b) enumerates the specific crimes which constitute "unlawful activity" for the purposes of § 1952(a). These include bribery.

Defendant notes that the statute requires use of a facility *in* interstate commerce rather than a facility *of* interstate commerce. In the realm of securities regulation this difference in prepositions has been used to distinguish between statutes requiring actual interstate activity ("in") and mere intrastate use of an instrumentality of commerce which otherwise runs interstate ("of"). *See Spilker v. Shayne Laboratories, Inc.*, 520 F.2d 523, 525 (9th Cir.1975), and cases cited therein. This distinction was relied on by Judge Metzner in holding that when a Travel Act prosecution is based on use of the telephone wires, actual interstate calls must be shown to satisfy the "in" interstate commerce requirement. *United States v. De Sapio,*

299 F.Supp. 436, 448–449 (S.D.N.Y.1969), *aff'd.*, 435 F.2d 272 (2d Cir.1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971). The Government answers that too much should not be made of the "in-of" distinction, for Congress itself was not particularly careful in its use of this language. The specific example cited is the House Report on the Travel Act, which states that the Act is intended "to prohibit ... the use of the facilities *of* interstate ... commerce, including the mail, in aid of racketeering enterprises." (emphasis added). H.R.Rep. No. 966, 87th Cong., 1st Sess., *reprinted in,* 1961 U.S. Code. Cong. & Ad.News 2664, 2664–65. The force of this argument is undercut somewhat by the fact that the drafters of the House Report may not have had the same motive for painstaking scrutiny of their language as do legislators. Their writing is, after all, exegesis rather than text. Nevertheless, the point is well-taken; this discrepancy cautions against excessive reliance on a single preposition.

The Government also raises an affirmative argument in defense of its position. It argues that the language of § 1952 differentiates use of the mail from use of other facilities by referring to the mail separately: "... uses any facility in interstate ... commerce, including the mail...." 18 U.S.C. § 1952(a). It is argued that

> by singling out the mail from other facilities in the Act's language, Congress plainly intended to make clear that it considered the mails to be a "facility in interstate ... commerce" *by its very nature;* thus the phrase, "including the mails [sic]," as used in the statute, is intended to be descriptive of a "facility in interstate ... commerce," whether or not

1. Defendant does not contest that the federal government has the power to impose criminal sanctions on those who use intrastate mailings to aid otherwise unlawful activity, nor would such an objection succeed. *See, e.g., Electric Bond & Share Co. v. SEC,* 92 F.2d 580, 588 (2d Cir.1937); *Holmes v. United States,* 134 F.2d 125, 135 (8th Cir.1943). He simply argues that Congress has not chosen to do so.

2. The Government informs me that Judges Edelstein and Owen of this Court recently summarily denied identical motions in substantially similar cases, *United States v. Sollitto,* 84 Cr. 636 (DNE) and *United States v. DiMiceli,* 84 Cr. 542 (RO). This appears to be so, but in neither case did the judge file a written analysis of his reasoning, and, with due respect to my brethren, my own analysis leads me to a different conclusion.

the mails are used in an interstate fashion in that particular case.... Indeed, had Congress intended the construction now urged by Varbaro ... it could easily have used the phrase, "any facility, including the mails, in interstate ... commerce" to make clear that it deemed interstate mailing necessary.

Government's Memorandum of Law in Opposition at 6–7.

The argument has some merit. The grammatical implication of placing "including the mail" after "commerce" rather than "facility" is to make it appear that the mail is intended to be taken as not merely a facility but a facility in interstate commerce. In opposition, defendants cite of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). Section 17(a) forbids securities fraud by way of "any means or instruments or transportation or communication in interstate commerce *or by the use of the mails.*" (emphasis added). The argument is that this statute demonstrates that when Congress intends to hinge liability on any use of the mails it does so by separating entirely the reference to the mails from the reference to a "facility in interstate commerce."[3] Defendant argues, of course, that the absence of such a separate reference to any use of the mails in § 1952(a) indicates that Congress intended the reference to "mail" to be governed by "facility in interstate ... commerce" and thus to require an interstate mailing.

The statutory language appears to wrestle itself to a draw. Both parties' arguments are, in isolation, persuasive. Added together, they indicate that drawing any firm conclusion solely from the statutory language is unwise. The references are simply too ambiguous to give a conclusive answer on this relatively subtle point.

It is a familiar principle of statutory construction that when the language of the statute is ambiguous, courts must turn to the legislative history, construing the statute in light of the purposes it was designed to serve. *Kokoszka v. Belford,* 417 U.S.

642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). The intent of the drafters, according to the Report of the House Judiciary Committee, was to combat the interstate activities of organized crime. H.R. Rep. No. 966, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad. News 2664. The bill grew out of the concern of Attorney General Robert Kennedy with racketeers who lived in one state while managing and profiting from criminal activities in another. The need for federal intervention in the prosecution of such traditionally state crimes was justified by the difficulty local law enforcement officials encountered in prosecuting the out-of-state bosses. As Kennedy's testimony is summarized in the Report, "[t]he racketeer would be beyond the control of the police in the State of operation and living as a respected citizen in the State of his abode." *Id.,* at 2665. The Report is at pains to point out that the bill is not intended to pre-empt state prosecution of the predicate unlawful activities. *Id.*

The Supreme Court has summarized congressional intent thus: "§ 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." *Rewis v. United States,* 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). In considering somewhat different facts, *Rewis* warned that "an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers [of gambling operations, the specific crime prosecuted in *Rewis* ], a matter of happenstance, would transform relatively minor state offenses into federal felonies." *Id.,* at 812, 91 S.Ct. at 1059. Given this risk, courts were counseled that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity [citation omitted]." *Id.* Later Supreme Court pronouncements have re-emphasized con-

---

**3.** As noted above, courts have interpreted the "in interstate commerce" language in § 17(a) to require actual interstate use of an "instrumentality" of commerce.

gressional preoccupation with interstate criminal activity. *See, e.g., Erlenbaugh v. United States*, 409 U.S. 239, 245, 93 S.Ct. 477, 481, 34 L.Ed.2d 446 (1972) ("... part[ ] of a comprehensive federal legislative effort to assist local authorities in dealing with organized criminal activity which, in many instances, had assumed interstate proportions and which in all cases was materially assisted in its operations by the availability of facilities of interstate commerce."); *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("Congress employed its now familiar power under the Commerce Clause of the Federal Constitution to prohibit activities of traditional state and local concern that also have an interstate nexus.").

Although our Court of Appeals has never directly addressed the specific question before me, its decision in *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), is instructive in this aspect of Travel Act interpretation. The *Archer* court dismissed a federal Travel Act prosecution of corruption within the Queens County district attorney's office, finding that the three interstate telephone calls on which federal jurisdiction was premised—two of which were made by a government agent and the third by a defendant in a futile attempt to contact the agent—were not substantial enough to satisfy the Act's requirement of interstate activity. It must be emphasized that *Archer*'s primary concern, the manufacture of federal jurisdiction by federal prosecutors, is not present here. Nevertheless, *Archer* sheds light on the importance of an interstate nexus to a Travel Act prosecution.

First, it must be noted that *Archer* is implicitly a ratification of the correctness of Judge Metzner's holding in *De Sapio, supra*, that when a telephone call is the jurisdictional premise of a Travel Act prosecution the call must travel interstate. Otherwise Judge Friendly's concern with the manufacture of federal jurisdiction by way of the artificial creation of interstate calls would be pointless. Plainly the *Archer* defendants made plenty of intrastate calls on which federal jurisdiction could be premised, if intrastate calls would suffice. There is no indication in the opinion, however, that telephone calls are the only means of communication with which *Archer* is concerned. Judge Friendly's discussion of the legislative history of the bill emphasizes that Congress was concerned with truly interstate crime. 486 F.2d at 679–680. Indeed, in a significant footnote he notes that the expansive jurisdictional language on which the Government now relies was added by Congress "[p]ossibly through inadvertence ... during [the Act's] rush toward passage." 486 F.2d at 679 n. 10. He further comments that "the legislative background at least indicates that Congress did not regard the use of interstate facilities for purposes other than travel or transportation as among the central targets of the Act." 486 F.2d at 680 n. 10.

*Archer*'s ultimate holding is that the interstate activity on which a Travel Act prosecution is premised must, if it is supplied by governmental activity, have some substantial relationship to the crime. 486 F.2d at 685–686. This holding is premised not upon the narrow ground that the language of the statute requires telephone use to be interstate, as in *De Sapio*, but upon the impression which emerges so strongly from the legislative history that Congress sought to inhibit only truly interstate crime. *See*, 486 F.2d at 679–681, 686. Because this is so, the holding has implications stretching beyond governmentally-created jurisdictional facts. It implies that every prosecution must involve *some* interstate activity. There is no hint in either the opinion or the legislative history it cites that mails were exempt from congressional intent. Of course, the role of the mails was not directly an issue in *Archer*. But *Archer*'s emphasis on the interstate concerns of Congress is nonetheless instructive.

The contemporary legislative expressions of intent are unambiguous in indicating exclusive congressional concern with interstate crime. The Government argues, however, that these must be tempered with a more recent indication of Congress's aims.

The omnibus crime bill enacted in the last days of the most recent Congress, The Comprehensive Crime Control Act of 1984, contains a provision akin to § 1952. Codified as 18 U.S.C. § 1952A, this new statute makes involvement in "murder-for-hire" a federal crime. The jurisdictional language sanctions "[w]hoever travels in or causes another ... to travel in interstate or foreign commerce, or uses or causes another ... to use the mail or any facility in interstate or foreign commerce ..." in connection with the hiring of a killer. The Government notes that this statute, directed at a problem similar to those which concerned the Travel Act's drafters, unequivocally premises federal power on any use of the mails. It argues that Congress intends the two statutes to be interpreted identically, citing as authority the Senate Judiciary Committee's report on the statute.

It must first be remarked upon that although the two statutes are numbered similarly, they are worded differently. Section 1952A quite clearly premises federal jurisdiction on any use of the mails by separating the reference to the mails from the "facility" reference; as discussed at length above, § 1952 does not. In fact, § 1952A supports defendant's position, noted earlier, that when Congress wishes to premise federal jurisdiction upon any use of the mails it does so by unambiguously separating the references to the mails and the other facilities of interstate commerce.

Further, I cannot accept the Government's characterization of the two statutes as "dealing with the same subject matter" so as to imply that they should be identically interpreted. See Hargrave v. Oki Nursery, Inc., 646 F.2d 716, 720 (2d Cir.1980). Section 1952A is aimed at one very specific crime, the hiring of individuals to commit murder. As the Senate Report discusses at length, the grave nature of this crime makes it of special federal concern. S.Rep. No. 225, 98th Cong., 1st Sess. 304–305 (1983). Indeed, the Senate Committee did not anticipate that all such crimes would be federal concerns but only those of particular seriousness. Id. at 305. In contrast,

§ 1952 deals with a much wider spectrum of far less serious crimes. It is quite rational to suppose that Congress wished to give prosecutors the statutory tools to reach every murder-for-hire with any federal nexus but to limit federal government involvement in lesser crimes to those with the type of interstate connections which make local prosecution difficult or impossible. See, e.g., Rewis, supra, 401 U.S. at 811, 91 S.Ct. at 1059. Not only is that rational, the statutory histories reveal that it is what was intended.

The Government emphasizes a footnote in the committee report which, it is claimed, indicates congressional intention "that the statutes be construed similarly." The footnote in question is only marginally pertinent here. It states that the committee "intends the full breadth of the phrase 'any facility in interstate or foreign commerce' as used in [the Travel Act] also be applicable here. See Erlenbaugh v. United States, 409 U.S. 239, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) (interstate newspaper)," and entirely fails to mention the mails. S.Rep. No. 225, supra, at 306 n. 5. Yet even if the footnote stated precisely what the Government claims that it does, two factors would give me pause in retroactively amending § 1952 to include every use of the mails. First, the views of a subsequent Congress on interpretation of a statute cannot override the unmistakable intent of the enacting one. Teamsters v. United States, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977). I think the intent of the 87th Congress is quite clear. More important is the view of the most recent Congress as expressed in other portions of the very report on which the Government relies. One of the first issues mentioned in the report's discussion of § 1952A is its encroachment on what has traditionally been regarded as a crime of state concern, murder. The committee more or less apologizes for involving the federal government in murder prosecutions, justifying the intrusion by noting the gravity of the crime and its intention that only the most serious examples will be

federally prosecuted. In other words, even in enacting § 1952A Congress sought to upset the traditional distribution of federal and state power as little as necessary to accomplish its aims. The lesson can be well taken here. In enacting § 1952, Congress sought to inhibit crime which, for whatever reason, stretched from one state into another. The interpretation of § 1952 the Government now proposes would intrude the federal government into vast areas of traditional state concern without in the least furthering Congress's express aims. The spirit of the drafters of § 1952A is furthered most by the more restrictive interpretation of § 1952.

■ In conclusion, examination of the legislative history of the statute and its subsequent judicial construction fails utterly to support the prosecution's position. In enacting the Travel Act, Congress was not acting to safeguard the integrity of the mails. It had a different, very specific, purpose in mind: to provide federal prosecutors with a tool to fight certain types of otherwise "local" crime which were inspired and conducted by individuals who operated beyond the prosecutorial grasp of local law enforcement officials. The idea that an intrastate mailing is sufficient to trigger the Act's sanctions—at least when, as here, there is no other "interstate nexus"—is wholly inconsistent with this purpose. Further, the idea threatens to expand federal prosecutions far beyond proper bounds. The Government's theory would convert to federal crimes all instances of the local crimes which are enumerated in § 1952(b) whenever a letter is mailed in the midst of their commission. There is no indication Congress intended this; on the contrary, the Supreme Court has implicitly held that Congress had no intention to alter accepted federal-state relationships and convert "relatively minor state offenses" into federal crimes. *Rewis, supra,* 401 U.S. at 812, 91 S.Ct. at 1059. The reference to the mail in the statute must be read in light of congressional desire to hamper interstate crime. There is nothing in the history which supports the Government's theory that use of the mail was intended to be excepted from this general intent. Therefore, when only an intrastate mailing is proven, some other "interstate nexus" must be shown. The Government does not contend that defendant made any interstate travels, communications, or mailings in the course of committing the bribery charged. Count One is dismissed.

## II.

■ The defendant's second contention is that the mail fraud count, Count Two, should be dismissed because the mailings which the Government intends to prove at trial "could not have furthered the alleged fraudulent scheme" which the statute requires. Defendant's Memorandum, at 12. The Government will apparently seek to prove that Varbaro handed a Staten Island electrical inspector at a Staten Island worksite one hundred dollars. The mailings which the Government has charged are Varbaro's initial written application for an electrical inspection, apparently mailed by Varbaro to the Bureau of Electrical Control in Manhattan, and his permit to perform electrical work, mailed by the Bureau to Varbaro. Defendant contends that these were not sufficiently connected with the bribery to satisfy the statute, which requires the mails be used "for the purposes of executing" a scheme to defraud. 18 U.S.C. § 1341.

I must agree with the Government that this motion is premature. Where resolution of a motion depends upon facts which do not emerge clearly from the indictment a trial is necessary. Rule 12(b), Fed.R. Crim.P. Whether the mailings were "incident to an essential part" of the scheme to defraud, *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), depends upon the contours of the scheme proven. It may be, as defendant contends, that the scheme did not involve approval of substandard work or that it ended prior to the mailings, but these are questions of fact which must be explored at trial. They may not be raised in a pretrial challenge to the indictment. Rule 12(b), Fed.R.Crim.P.;

*cf. United States v. DePalma,* 461 F.Supp. 778, 794 (S.D.N.Y.1978); *United States v. Black,* 291 F.Supp. 262, 264 (S.D.N.Y.1968); *United States v. Greater Syracuse Board of Realtors, Inc.,* 449 F.Supp. 887, 899 (N.D.N.Y.1978); *United States v. Walker,* 514 F.Supp. 294, 302 (E.D.La.1981). Defendant is free to renew his motion at the close of the evidence.

### III.

■ Defendant next challenges the specificity of the indictment. My decision in part I of this opinion moots any objections to the specificity of Count One. The objection to Count Two is that it fails to specify the date, sender, addressee, and content of the mailed items on which the mail fraud charge is premised. In response to this claim, the Government has consented to supply such a list to defense counsel "well in advance of trial." This will be adequate to cure the defect. *See United States v. Margiotta,* 646 F.2d 729 (2d Cir.1981), *cert. denied,* 461 U.S. 913, 103 S.Ct. 189, 77 L.Ed.2d 282 (1983). The Government is directed to supply the defendant before November 19 a list of the dates of mailing, senders and recipients, and contents of the mailings on which Count Two is based.

### IV.

■ Explanation of the fourth ground for dismissal requires recounting the background of this prosecution. Plaintiff was arrested along with a number of other contractors and several electrical inspectors from Richmond and Kings counties. The arrests were apparently the result of an investigation by New York City officials, but the cases were turned over to the Office of the United States Attorney for the Southern District of New York for prosecution. According to his statements at the time of the arrests, New York City Mayor Edward Koch asked federal officials to prosecute because of his belief that state court judges do not consider bribery of public officials a serious crime and do not impose harsh enough sanctions on those extending and accepting bribes.

Defendant contends that this maneuver shows a "reckless disregard for delicate principles of comity and federalism" and "thwarts" New York State public policy by denying to defendant the advantage of a particular defense under state law to a charge of bribery and a particularly helpful state rule of evidence.

Assuming the truth of these allegations—that defendant will in fact be denied certain helpful rules of law—I see nothing in the above which justifies dismissal of the indictment. These cases were consensually passed from local to federal authorities. Thus the risk against which principles of comity are designed to protect, that the federal government will usurp authority which is properly the states', is not threatened. Defendant has no right to be charged and tried under state authority when his actions constitute both a state and a federal crime. *See, United States v. Mandel,* 591 F.2d 1347 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). The charges in the indictment do state a federal crime, namely, mail fraud. *See, e.g., United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). While it may be true that the evidence will reveal, after trial, the type of small-time, harmless "tipping" seen in *United States v. McNeive,* 536 F.2d 1245 (8th Cir.1976), that possibility does not justify dismissal of the indictment, although the Government must, of course, prove a federal crime at trial. But the mere fact that a small amount of money is involved does not demonstrate the type of investigative and prosecutorial overreaching which caused the Second Circuit to rebel in *United States v. Archer, supra.* Nothing in this prosecution gives rise to cause for invocation of the Court's "supervisory power." *See United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983).

### V.

The defendant moves for an order directing the prosecution to file a bill of particu-

lars giving details of the scheme to defraud charged in Count Two. In particular, he wishes to know whether the Government contends that he received a specific *quid pro quo* in return for his alleged payment to the electrical inspector.

■ The purpose of a bill of particulars is to insure that a defendant is adequately apprised of the charges made against him, to avoid unfair surprise at trial, and to enable the defendant to prove double jeopardy if necessary. *Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1929); *United States v. Cafaro*, 480 F.Supp. 511, 517 (S.D.N.Y.1979). A bill is not to be used to accomplish discovery of the Government's evidence, *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974), or unduly to restrict the Government's presentation of proof at trial. *Carfaro, supra*, 480 F.Supp. at 517.

■ The Government's pretrial disclosures have already satisfied the bulk of defendant's request. It is clear when and to whom the Government contends the bribe was offered. No further disclosure along these lines is warranted. *See United States v. Gordon*, 493 F.Supp. 814, 816 (N.D.N.Y.1980), *aff'd.*, 655 F.2d 478 (2d Cir. 1981). The only remaining question is the purpose for which the Government intends to prove the bribe was offered. Ordinarily a request for such information would constitute an impermissible inquiry into the Government's theory, *United States v. Lavin*, 504 F.Supp. 1356, 1361 (N.D.Ill.1981), and defendant has failed to state any reason why the failure to order disclosure will cause him unfair surprise at trial. This request for further disclosure is denied.

## VI.

Finally, the defendant requests a pre-trial deposition of Israel Dembitzer. Dembitzer is the inspector to whom the bribe was allegedly offered. By the time the money changed hands, Dembitzer had apparently begun to work for the Government. He used a Nagra recorder to tape the conversation which transpired when Varbaro gave him the money. Varbaro requests a pre-trial deposition pursuant to Rule 15(a), Fed. R.Crim.P.

The rule permits a deposition when exceptional circumstances exist and the interests of justice would be served. Defendant claims that not all of his conversations with Dembitzer were recorded. He argues that the unrecorded conversations with Dembitzer, about which he wishes to elicit testimony, will demonstrate that he was entrapped. He notes that if for some reason Dembitzer is unavailable to testify the tapes of his conversations with defendant will nevertheless be introduced at trial. He will thus be incriminated but have no opportunity to present the evidence of entrapment which would serve as a defense to the charges. He argues that this potential prejudice justifies a deposition to preserve the exculpatory testimony in the event Dembitzer cannot testify.

■ Rule 15 depositions are not to be used for discovery but for the preservation of testimony. *United States v. Steele*, 685 F.2d 793, 809 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). As such, the Rule contemplates that parties take depositions only of their own witnesses, *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978), although for a defendant it is enough to show that the testimony is material to his defense. *United States v. Bronston*, 321 F.Supp. 1269, 1272 (S.D.N.Y. 1971). The burden is on the moving party to demonstrate circumstances justifying the depositions. *United States v. Whiting*, 308 F.2d 537 (2d Cir.1962), *cert. denied*, 372 U.S. 909, 83 S.Ct. 722, 9 L.Ed.2d 718 (1963).

■ It is commonly said that depositions are appropriate if a witness "is unavailable to appear at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir.1984). Although the rule does not necessarily require a showing of certainty that a witness will be unavailable, surely it requires a showing of a specific reason why the witness might not be available. Unfounded speculation is not enough. There is always

the possibility that a witness will not be available. This cannot create "exceptional circumstances."

 Nor are exceptional circumstances created by the fact that this witness possesses potentially exculpatory knowledge. Dembitzer is unusual in that he can allegedly supply inculpatory testimony which does not depend upon his presence—i.e., the tape recordings—and exculpatory testimony which does. Yet a moment's thought reveals that the argument defendant propounds could be raised in regard to any witness possessing knowledge material to a defense. There is always the risk that such people might disappear, leaving the prosecution's case intact while decimating the defendant's. The fact that here one witness is allegedly the source of both does not materially separate it from the ordinary situation. If Dembitzer possessed the exculpatory knowledge while another witness possessed inculpatory knowledge, defendant could not automatically take Dembitzer's deposition, although in that circumstance Dembitzer's absence would leave only inculpatory evidence. Nothing is changed by his being the source of both. There is nothing exceptional here.

Defendant has failed to carry his Rule 15(a) burden of showing exceptional circumstances. The motion for a pretrial deposition is denied.

### SUMMARY

Count One of the indictment is dismissed. Defendant's motions to dismiss Count Two, for a bill of particulars, and for a pre-trial deposition are denied. The Government is directed to detail the mailings as described in section III, *supra*, by November 19, 1984.

It is SO ORDERED.