**Thomas H. ALLEN III, Personal Representative of the Estate of Barbara Allen, and Kathleen M. Allen, the dependent beneficiary of Barbara Allen, Plaintiffs,**

v.

**UNITED STATES of America, United Services Automobile Association (a/k/a USAA), a reciprocal exchange company, the Board of Regents of the University of Wisconsin System, on behalf of the University of Wisconsin Hospital and Clinics, and Affiliated University Physicians, a non-profit organization, Defendants.**

No. 86–C–259–C.

United States District Court.
W.D. Wisconsin.

Sept. 3, 1987.

**1244**

Eric A. Farnsworth, DeWitt, Sundby, Huggett, Schumacher & Morgan, S.C., Madison, Wis., for plaintiffs.

David Sarnacki, Ass't U.S. Atty., Madison, Wis., for U.S.

David J. Schwartz, Louderman, Hayes, Van Camp, Priester, Strother & Schwartz, Madison, Wis., for Affiliated Univ. Physicians.

Harry Sauthoff, Thurow, Sauthoff and Alexander, Madison, Wis., for United Services Auto. Ass'n.

Charles Larsen, Asst. Atty. Gen. Madison, Wis., for Bd. of Regents of Univ. System.

## ORDER

Sept. 1, 1987.

CRABB, Chief Judge.

In a Report and Recommendation entered herein on August 7, 1987, the United States Magistrate recommended denial of the motion for summary judgment of the United States. None of the parties has objected to the recommendation. Plaintiffs have objected to one finding of the magistrate, which they characterize as parenthetical, and have also asked for the entry of partial summary judgment in their favor on two issues: the applicability of the Federal Medical Care Recovery Act, 42 U.S.C. § 2651 *et seq.*, to a claim against an insured serviceman and the priority of government claims under the Act.

From my own review of the magistrate's report and the parties' briefs, I am prepared to adopt the magistrate's report as the court's own, with the clarification requested by plaintiffs. The magistrate's analysis of the applicable statutes is thorough and persuasive. I agree with him that Congress did not intend that "third party," as used in § 2651 would apply to an insured whose negligence was responsible for the injuries and damages covered by the insurance policy. With respect to plaintiffs' request for clarification, I do not understand the magistrate to recommend a construction of either 42 U.S.C. § 2651 or § 2652 that would deprive Kathleen Allen of any right to receive the proceeds of the insurance policy at issue as against the United States to the extent that she has suffered pecuniary damages for the loss of the society and companionship of her mother. To the extent that the magistrate's comment in the next to last paragraph of his opinion suggests that Kathleen Allen would not be an "injured person" under 42 U.S.C. § 2652, I do not adopt the comment.

█ It is proper for a court to enter summary judgment for a non-moving party if the undisputed facts and the law support it. In this case, there is no dispute about the facts material to the question of the priority of the interest of the United States in the insurance proceeds, and the law supports the interpretation of § 2651 set forth by the magistrate. Therefore, I will grant partial summary judgment to plaintiffs on those two issues, as they have requested.

## ORDER

IT IS ORDERED that the Report and Recommendation of the United States Magistrate, entered herein on August 7, 1987, is ADOPTED as the court's own, with the one clarification set forth above. FURTHER, IT IS ORDERED that the motion of the United States for summary judgment is DENIED and the motion of the plaintiffs for partial summary judgment is GRANTED on the issues of the applicability of the Federal Medical Care Recovery

Act, 42 U.S.C. § 2651 *et seq.*, to claims against insured servicemen and the priority of government claims under the Act.

The Clerk of Court is directed to schedule a status conference in this case for the purpose of scheduling further proceedings in the case.

## REPORT AND RECOMMENDATION

JAMES GROH, United States Magistrate.

Plaintiffs Thomas Allen, as Personal Representative of the Estate of Barbara Allen, and Kathleen Allen bring this civil action seeking a declaration of their rights vis-a-vis the remaining defendants with respect to the proceeds of an insurance policy issued by defendant USAA, which proceeds have been paid over to the Clerk of Court. One of the defendants, the United States of America, has filed a motion for summary judgment. (Dkt. # 29) The government asserts that it is entitled under the Federal Medical Care Recovery Act (42 U.S.C. § 2651 *et seq.*) to be reimbursed, from the said proceeds, for sums it expended for the care of Barbara Allen in connection with injuries she suffered through the negligence of her husband, a retired Marine officer, in an automobile accident. The government also urges that its entitlement is prior to that of any other party, in the event the deposited funds are insufficient to satisfy the claims of all.

Based on the parties' proposed facts and the record in the case, I find the following facts for the sole purpose of deciding this motion:

## FINDINGS OF FACT

1. Plaintiff Thomas H. Allen III is an adult resident of the State of Wisconsin and brings this action as the duly appointed representative of the estate of Barbara Allen. Plaintiff Kathleen Allen is an adult resident of the State of Wisconsin and asserts her claim as a dependent child of Barbara Allen at the time of Barbara Allen's death. (Compl. ¶¶ 2, 3) [1]

2. Defendant United States of America administers the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). 10 U.S.C. § 1072(4). Barbara Allen, her husband, retired Lt. Col. Thomas H. Allen, Jr. of the United States Marine Corps, and their children were covered by CHAMPUS as a military family for a specified portion of health care obtained by them from civilian hospitals and doctors. (Compl. ¶ 10; Gov't Answer ¶ 10, Dkt. # 15)

3. United States Automobile Association (USAA) is a Texas insurance corporation with its principal place of business in the state of Texas. USAA issued a policy of automobile insurance to Col. Allen, which afforded liability, medical payments and accidental death coverage. (Compl. ¶¶ 6, 9; Gov't Answer ¶¶ 6, 9; Dkt. # 47, Ex. A) [2]

4. The Board of Regents of the University of Wisconsin Systems (the Board) maintains the University of Wisconsin Hospital & Clinics in Madison, Wisconsin, and provided medical services to Barbara Allen prior to her death, a portion of which was paid for under CHAMPUS. (Compl. ¶¶ 7, 12–13; Board Answer ¶ 1, Dkt. # 7; Gov't Prop.Facts ¶ 8; Board Response ¶ 1, Dkt. # 36)

5. Affiliated University Physicians (Affiliated) is a non-profit Wisconsin corporation with its principal place of business in Madison, Wisconsin. Affiliated conducts a billing service for physicians of the University of Wisconsin Hospital & Clinics, which physicians provided medical services to Barbara Allen prior to her death, a portion

---

**1.** The government has denied knowledge or information sufficient to form a belief regarding paragraphs 1 and 2 of plaintiffs' complaint, and has not otherwise offered any admission as to plaintiffs' relationships to Barbara Allen. The proposed finding is intended simply to set out, for purposes of identifying the parties, plaintiffs' allegations in this regard. In the unlikely event

there is any real dispute on this issue, it is of no consequence to the disposition of this motion.

**2.** A certified copy of the complete policy appears as Exhibit A to plaintiff's supplemental memorandum (Dkt. # 47). All future references will simply be made to the policy (Pol. p. _____). For convenience of reference, I have numbered the pages of the policy in the lower right corner.

of which was paid for under CHAMPUS. (Compl. ¶¶ 8, 12; Affiliated Answer ¶¶ 1–3, Dkt. # 9)

6. Jurisdiction exists pursuant to 28 U.S.C. § 1331.

7. On January 24, 1985, in Dane County, Wisconsin, Barbara Allen was a passenger in an automobile operated by Col. Allen. Due to Col. Allen's negligence, his automobile collided with another automobile. Col. Allen was killed instantly. Barbara Allen suffered serious injuries as a result of the accident and died about one month later, on February 21, 1985. (Gov't Prop.Facts ¶¶ 4–6)

8. Because of Col. Allen's status as a Marine Corps retiree, the United States was authorized and required by law to provide, and did provide, medical care and treatment to Barbara Allen to the extent of $94,138.28 through CHAMPUS prior to her death from the injuries sustained in the automobile accident. (Gov't Prop.Facts ¶¶ 3, 8; Pl.Response ¶ 8, Dkt. # 34; Board Response ¶ 1; Affiliated Response)

9. Apart from the medical care provided at government expense, Mrs. Allen's estate was entitled to, or has made claim for, certain payments from USAA under the automobile policy. The policy provides liability coverage in the amount of $100,000, medical payments coverage in the amount of $20,000 (including $10,000 from a seat belt endorsement), and a $10,000 death benefit (Gov't Prop.Facts ¶ 4; Dkt. # 47, Ex. A). USAA does not contest its obligation

to pay the above amounts under the policy and has paid the said sum ($130,000) to the Clerk of Court to be distributed as the court may order. (Stipulation and Order dated May 12, 1986 (Dkt. ## 5 & 6))

10. The instant lawsuit was filed on April 17, 1986, by Thomas Allen III, on behalf of Barbara Allen, as personal representative of her estate, and Kathleen Allen, on her own behalf, as a dependent child of Barbara Allen. Plaintiffs seek a declaration of their rights to the USAA insurance proceeds as against the claim of the United States and the claims of Affiliated and the Board, for the unpaid portions of the health care rendered to Barbara Allen. The government claims an interest in the policy proceeds to the extent of $94,138.28; Affiliated claims an interest of $11,391.06; and the Board claims an interest of $28,573.26. The Estate of Barbara Allen asserts an as yet unliquidated claim against the proceeds for the conscious pain and suffering of Barbara Allen. Kathleen Allen asserts an unliquidated claim for pecuniary damages for loss of the society and companionship of Barbara Allen, pursuant to Wis.Stat. 895.04. The aggregate of the claims of all the parties exceed the maximum amount of USAA's obligation under the policy—the $130,000 paid into the court.[3]

## CONCLUSIONS OF LAW

The government contends that it is entitled to judgment as a matter of law on its

---

**3.** I make this finding despite the government's contention, in its reply brief, that it "has consistently disputed the claim that the available policy limits are inadequate to cover plaintiffs' claims; the plaintiffs have never produced any evidence, formally or informally, to support the amount of their claims." (Dkt. # 40, p. 1) Plaintiffs took issue with that position in a letter to Judge Crabb dated November 19, 1986. (Dkt. # 41) Plaintiffs argued that the government had previously agreed that the USAA policy proceeds were inadequate to cover plaintiffs' claims, and that the only question on summary judgment was one of priority. A hearing was held on November 25, 1986, to settle the matter. While no order was entered, the Clerk's notes state "Damages not to be briefed" (Dkt. # 42)—suggesting that the motion is in fact limited to the priority question. I note, in addition, that plaintiffs' failure to prove and fix the amount of their

damages seems to be irrelevant at this stage of the proceedings. It is the government that has moved for summary judgment, asking the court to rule as a matter of law that it has a stake in, and priority to, the insurance proceeds. Those questions can be decided notwithstanding the absence of proof of plaintiffs' damages. Given the posture of the case and the basis for the government's motion, it appears groundless to suggest, as the government does, that summary judgment should be granted in its favor because plaintiffs have so far failed to prove the amount of their entitlement to the insurance fund. The government, moreover, has proposed no finding of fact which would negate Col. Allen's liability for pain and suffering or loss of society, nor has it proposed any finding of fact which would foreclose the trier of fact from finding damages as a matter of law.

claim of $92,138.28 against the USAA policy proceeds, and that no issue of fact remains to be resolved with respect to that issue.[4] It bases its entitlement on the Federal Medical Care Recovery Act (hereafter, FMCRA or the "Act"), 42 U.S.C. § 2651–2653, which reads, in pertinent part:

§ **2651. Recovery by United States— Conditions; exceptions; person liable; amount of recovery; subrogation; assignment**

(a) In any case in which the United States is authorized or required by law to furnish hospital, medical, surgical, or dental care and treatment (including prostheses and medical appliances) to a person who is injured or suffers a disease, after the effective date of this Act, under circumstances creating a tort liability upon some third person (other than or in addition to the United States and except employers of seamen treated under the provisions of section 249 of this title) to pay damages therefor, the United States shall have a right to recover from said third person the reasonable value of the care and treatment so furnished or to be furnished and shall, as to this right be subrogated to any right or claim that the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors has against such third person to the extent of the reasonable value of the care and treatment so furnished or to be furnished. The head of the department or agency of the United States furnishing such care or treatment may also require the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors, as appropriate, to assign his claim or cause of action against the third person to the extent of that right or claim.

**4.** This motion does not present issues as to the merit, amount, or priority (*inter se*) of the claims of the other litigants to the policy proceeds. There are, in any event, unsettled factual questions on the issues of liability and damages which would foreclose entry of summary judgment on those issues. Nor does the lawsuit itself involve any claims against the estates of either Col. Allen or Barbara Allen apart from the respective entitlements of the parties to the

### 1. *Government's Claim to Medical Payments and Life Insurance Benefits*

USAA does not contest its liability and has deposited an amount equal to its maximum exposure under the policy, $130,000, with the Clerk of Court. That sum is the aggregate of amounts payable under three separate policy provisions. A brief examination of those provisions will simplify the consideration of the motion somewhat.

The policy was issued to Col. Allen and he is the named insured. (Pol. p. 3) Of the $130,000, $10,000 came from the Medical Payments Coverage provision (Pol. pp. 2, 18). Barbara Allen was a covered person under this provision as a family member as well as an occupant of the covered auto. (Pol. p. 18) The medical payments benefit was increased to $20,000 under the Seat Belt Endorsement (Pol. p. 31). In addition, the Seat Belt Endorsement provided a death benefit of $10,000 payable to Barbara's beneficiary, which, under the definitions provision of the endorsement, was her estate. Thus, $30,000 of the $130,000 paid into the Court were derived from the Medical Payments Coverage and the death benefit provision. The remaining $100,000, to be considered below, was paid under the Liability Coverage provision (Pol. p. 2, 15–18).

█ It is, I think, evident that the FMCRA will not support any claim by the government to the amounts payable under either the medical payments or death benefit provisions. The ability of the government to recover under § 2651(a) is expressly limited to claims which Barbara Allen might have against third persons sounding in tort ("... under circumstances creating a *tort liability* upon some third person ..." 42 U.S.C. § 2651(a)) (emphasis added).

policy proceeds. Whether the other parties have valid claims of demonstrable value is of no consequence to the government's motion, because, as will be discussed below, (*infra* p. 1257), it is the government's further position that once its claim against the policy proceeds is established, the government is entitled to be paid first under 31 U.S.C. § 3713. (U.S. Brief, p. 5; Dkt. #30)

Unlike the liability coverage, which predicates the insurer's liability upon a determination of the insured's (Col. Allen's) legal responsibility for injuries to others or their property,[5] the medical payments provision creates an unqualified contractual obligation to "pay reasonable expenses incurred for necessary medical and funeral services because of bodily injury" sustained by a covered person. (Pol. pp. 18, 31) That obligation to pay is in no way conditioned upon considerations of fault or the tort liability of USAA or any other person or entity.[6]

The contractual nature of the obligation is equally plain with regard to the life insurance benefit:

> We will pay $10,000 to the beneficiary of a covered person who dies as the direct result of bodily injury sustained in an automobile accident.

(Pol. p. 31) By the language of the policy, the contractual right of recovery is vested in the estate of Barbara Allen. (Pol. p. 31)

Since the medical payments and life insurance are obligations in contract, the government cannot maintain an action for those aspects of the policy proceeds under the FMCRA. *United States v. Government Employees Ins.*, 330 F.Supp. 1097 (E.D.N.C.1971), aff'd, 461 F.2d 58 (4th Cir. 1972) (medical expense provision); *United States v. Travelers Indemnity Co.*, 729 F.2d 735, 737 (11th Cir.1984) (uninsured motorist coverage).[7]

### 2. Government's Claim To The Proceeds Of Liability Insurance Coverage

As the government's submissions have acknowledged no distinction among the types of coverage available under the policy, it is unclear whether it claims that USAA is a "third person" liable to the government in tort with respect to the liability coverage provision of the policy. The answer to this question has a bearing upon the construction to be placed upon the FMCRA and also takes on some importance with respect to the government's claim of priority.

■ The Eighth Circuit specifically addressed the question in *United States v. Farm Bureau Ins. Co.*, 527 F.2d 564 (8th Cir.1976) and held that the liability carrier is not liable in tort. I am satisfied that is the correct view. The carrier's obligation to pay is based upon its *contractual* undertaking to indemnify its insured for the *insured's* tortious conduct. Thus, the court in *Farm Bureau* affirmed the district court's refusal to entertain the government's direct action against the liability carrier under the FMCRA. The same result (dismissal) is avoided in this case only because of the Wisconsin statute (Wis. Stats. § 803.04) which permits an injured person to maintain a direct action against the insurer (and without making the insured a party to the action). The statute,

---

**5.** PART A—LIABILITY COVERAGE
We will pay damages for bodily injury or property damage for which any **covered person** becomes legally responsible because of an auto accident. (Pol. p. 15)

**6.** The USAA policy combines several distinct forms of coverage in a single policy—often referred to as a multiple-line policy. Each form of coverage could as well have been the subject of a separate policy; i.e. a liability policy, a personal medical policy for accidental injuries, and an accidental death policy. While joined in a single instrument, it is appropriate, and important, to read each coverage as if it were a separate policy. See *Severson v. Milwaukee Auto Ins. Co.*, 265 Wis. 488, 490–94, 61 N.W.2d 872 (1953); *Truitt v. Gaines*, 199 F.Supp. 143, 153 (D.Del.1961).

**7.** Subsequent to the passage of the FMCRA Congress adopted legislation to permit the Veterans Administration to reach claims against medical insurance benefits, no-fault automobile insurance benefits, and other "third persons" whose liability was not based in tort (and thus would not be reached under FMCRA). See 38 U.S.C. § 629 and H.R.Rep. No. 97–79, 97th Cong., 1st Sess. 29, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1685, 1713. Even more to the point, in 1986 Congress added a new section to Chapter 55 of Title 10, United States Code (which governs the provision of medical and dental care to all military personnel and their dependents), specifically to permit the recovery of the cost of care provided in military hospitals to retirees and dependents from any "third party payer," which is defined as an entity which provides "an insurance, medical service, or health plan by contract or agreement." See 10 U.S.C. § 1095.

however, is procedural only. It does not affect any substantive right of the parties.

> [T]he fact that a third party can sue an insurer of a motor vehicle direct ... without first recovering a judgment against the insured defendant does not enlarge the coverage afforded by such policy or determine the insured's liability thereunder. The third party can only recover from the insurer by virtue of the contract existing between it and its insured. [Citation omitted]
>
> Therefore, an insurance company's liability under the Wisconsin Direct Action Statute is derivative, i.e., the "insurer is not liable unless the assured is." *Hunt v. Dollar*, 224 Wis. 48, 271 N.W. 405, 409 (1937).

*Fagnan v. Great Central Ins. Co.*, 577 F.2d 418, 420 (1978).

It follows then, that USAA's obligation to pay here is based solely upon its contractual undertaking with Col. Allen to "pay damages for bodily injury" for which Col. Allen "becomes legally responsible because of an auto accident." (Pol. p. 15) The fact that Col. Allen's estate is not a party to this action poses no barrier to the determination of his liability (in tort), but neither does it alter the fact that USAA may be found liable, subject to the limits of the (liability) policy, only if, and to the extent, the insured (Col. Allen) is found liable. (*Fagnan*, 577 F.2d at 420)

In tendering its policy limit, USAA has declined to contest, for purposes of its contractual obligation, both the fact of Col. Allen's legal (tort) responsibility and the fact that the resulting damages will be at least equal to the $100,000 limits. What remains to be established, however, is the fact of Col. Allen's liability to these claimants and the extent of their damages under the governing law—the tort law of the

State of Wisconsin. The decision of USAA not to defend cannot be construed as an admission of liability to a particular claimant in a particular amount.[8] For purposes of this motion only, it will be taken as established that Col. Allen was liable in tort to Barbara Allen, and, therefore, to any of the claimants whose claims are lawfully founded upon that liability.

■ The remaining issue is whether the FMCRA applies at all when recovery is sought against a member of the uniformed services whose negligence gave rise to his/her own dependent's injuries.[9] While there have been a number of cases construing various aspects of the FMCRA, I have found none which has considered this question. My reading of the relevant statutes and their legislative histories has led me to conclude that the FMCRA does not, and was not intended to, diminish or deny to members of the uniformed services the rights to medical care statutorily granted to them and their dependents under the Dependents' Medical Care Act and the amendments thereto. 10 U.S.C. Chapter 55, § 1071 *et seq.* as amended [10] That act, which I shall refer to for convenience as Chapter 55, was adopted in 1958. While there have, of course, been alterations and additions over the years (which are of no particular consequence here), the basic structure of this comprehensive legislation remains intact. Prior to that legislation there was no express statutory basis for the provision of medical care to service personnel or their dependents; nor was there any uniformity among the branches as to eligibility or entitlements. See Report of Senate Committee on Armed Services, *reprinted in* 1956 U.S.Code Cong. & Admin.News, pp. 2698–2699.

---

8. As noted above, the merit and relative value of the various non-government claims are not presented on this motion.

9. This case does not present, and I have not considered, the reciprocal question; i.e. where recovery is sought against the dependent whose negligence caused the member/sponsor's injuries. Neither does this case present the separate question of the government's right to restitution

where the injured person has actually recovered the value of the medical care from the tortfeasor.

10. Pub.L. 85–861, § 1(25)(B), September 2, 1958, 72 Stat. 1445. The Act is codified in Ch. 55, Title 10, United States Code (10 U.S.C. § 1071 *et seq.*).

The purpose of the legislation was not left to inference. Section 101 of that act stated:

> The purpose of this Act is *to create and maintain high morale throughout the uniformed services* by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and their dependents. [emphasis added] [11]

That expression survives today in 10 U.S.C. § 1071. In addition to maintaining high morale, the improvement of dependent medical care was seen to be of importance in inducing competent persons to pursue military careers. Thus, the report of the Senate Armed Services Committee states:

### IMPORTANCE OF IMPROVED SYSTEM

Dependent medical care is one of the items dealt with generically under the term of "fringe benefits." Within the past few years, the Congress has devoted extensive consideration to the maintenance and restoration of fringe benefits as part of a program to make military careers more attractive and to meet the competing attractions of private industry. *Although there has been no legislative action that curtailed the entitlement of dependents to medical care at Government expense, the amount of medical care that can be furnished in the existing circumstances is not a powerful inducement to a career in the uniformed services.* This is true because private industry is extending liberal medical care privileges and because the maintenance of active-duty strengths at higher than normal peacetime levels, with an attendant increase in the number of dependents needing care, has created a workload that can hardly be met by the limited facilities and available physicians.

*The President, the Secretary of Defense,* and the Assistant Secretary of Defense for Manpower, Personnel, and Reserves *have emphasized in recent communications to the Congress the desirability of liberalizing dependent medical care as one method to motivate competent persons to elect a career in the uniformed services.* [emphasis added] 1956 U.S.Code Cong. & Admin.News, p. 2699.

With regard to that inducement, and the expectations of the members of the Armed Forces, it is of central importance to note that the Dependent's Medical Care Act did not, either as adopted or as amended, establish any condition or qualification based upon fault or other restriction upon the extent of the government's undertaking to provide dependent medical care. Indeed, in the entire history of Chapter 55 I have found only one, extremely narrow, provision (pertaining to reservists) under which the government's obligation to provide medical care is limited in any way based on cause.[12]

Throughout his active service,[13] and at the time of the automobile accident in issue, Col. Allen enjoyed the benefits of this legislative scheme—benefits "unique to [the] service status." *United States v. Johnson,* —— U.S. ——, 107 S.Ct. 2063, 2068 n. 10, 95 L.Ed.2d 648 (1987). As a retired Marine officer he was entitled by statute to medical care at government expense, either at a military facility or in a civilian hospital, for himself and for his dependents. 10 U.S.C. §§ 1074(b), 1076(b) and 1086(c). As his spouse, Barbara Allen was a dependent (10 U.S.C. § 1072) and therefore entitled to medical care at

---

11. *Supra* n. 10.

12. In 1983 Congress adopted 10 U.S.C. § 1074a which provides that a reservist on inactive duty, or on active duty for less than thirty days, is not entitled to benefits "if the injury, illness or disease, or aggravation [thereof] ... is the result of the *gross negligence or misconduct* of the member." 10 U.S.C. § 1074a(c). [emphasis added] However, it does not appear that health benefits would be denied the dependents of such a member who may have died from the injuries (see 10 U.S.C. § 1086(c)(2)(B)), even though they may have been injured in the same accident due to the member/sponsor's gross negligence.

13. The record reveals no facts about Col. Allen's service record. Given his branch and rank, it is not unreasonable to assume that it extends back to at least the 1960's.

government expense.[14] Following the accident she did receive care at a civilian facility (10 U.S.C. § 1086) and the government paid its prescribed share.

It will be evident that the government had no interest in Barbara Allen's health or welfare apart from her relationship to Col. Allen. Congress required the Secretary of Defense to provide medical care to Barbara Allen and other dependents in order to benefit the members of the uniformed services and to achieve those ends and goals that are peculiar to that "specialized society" which is the military, *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); i.e. to foster and enhance the morale, unity, commitment, esprit de corps, and sense of duty and loyalty to one's service and one's country. *United States v. Johnson,* 107 S.Ct. at 2069. In more practical terms, the provision of free or low cost health care to Col. Allen, his comrades and their dependents relieved the service member, unconditionally, of the financial burden of providing that care at his own expense. By this action the government would reimpose that burden through the FMCRA.[15]

It is against this background that the adoption of FMCRA must be considered. 42 U.S.C. § 2651 *et seq.* The roots of the Act can be traced to the decision of the United States Supreme Court in *United States v. Standard Oil Co.,* 332 U.S. 301,

67 S.Ct. 1604, 91 L.Ed. 2067 (1947). There, the government sought to recover the cost of medical treatment it had furnished to a serviceman, Etzel, for injuries sustained when he was struck by a truck negligently operated by the defendant's employee. The government also sought reimbursement of the compensation it had paid Etzel during the period of his disability. The government's claim, which was apparently based upon California law, was variously characterized as being for the loss of Etzel's services or for interference with the government-soldier relationship. *Id.* at 302–304, 67 S.Ct. at 1605–1606. It was not based upon subrogation.[16]

Noting the distinctively federal character of the relationship between the government and members of the Armed Forces, the court first dismissed the notion that the liability sought to be imposed should be determined by state law. *Id.* at 305, 310–311, 67 S.Ct. at 1607, 1609–1610.

The court also declined the government's invitation to exercise "creative judicial power to bring the *government-soldier relation* under the same legal protection *against tortious interferences by strangers ...*" [emphasis added] *Id.* at 312–13, 67 S.Ct. at 1610. If deferred, instead, to Congress as the appropriate branch for the determination of the policy and fiscal implications of such a step. Fifteen years later those deliberations produced the FMCRA.

---

**14.** It is not exactly correct to say the care provided was free, as some contribution, normally by way of an initial payment and co-insurance, was often required depending upon the status of the recipient or where the care was rendered. Such matters are not in controversy here.

**15.** It is unrealistic to assume the burden will be felt by the member alone. As a practical matter, the dependent would end up sharing it in most instances because a recovery against the negligent member/sponsor would deplete the common pool of resources to which the family unit looks to provide for itself. The very concept of dependency in Chapter 55 assumes that the member is the breadwinner and that the other members of the family are dependent upon him/her for their financial support.

**16.** The court took pains to point out that the government's suit was based upon an independent theory of tort liability and *"not simply to*

*subrogation to the soldier's rights* against the tortfeasors."* [emphasis added] *Id.* at 304, n. 5, 67 S.Ct. at 1606, n. 5. The Court of Appeals had considered the subject of the government's subrogation rights at some length, and had expressed some doubt whether the government ever had a right of subrogation without express statutory authorization. The Court of Appeals went on to say

[I]t seems clear that Congress did not intend that for tortious injuries to a soldier in time of war, the government should be subrogated to the soldier's claims for damages. It will be noted that Congress has provided that the government should have the privileges of assignment or subrogation in other somewhat similar situations [including, *inter alia,* the Federal Employee's Compensation Act and the World War Veterans Act].

*Standard Oil Co. v. United States,* 153 F.2d 958, 963 (9th Cir.1946), aff'd, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed.2d 2067 (1947).

The legislative history of the FMCRA leaves no doubt but that the Act was a direct response to the *Standard Oil* case. (See Report of Senate Committee on Judiciary, *reprinted in* 1962 U.S.Code Cong. & Admin.News, p. 2637.) It also seems clear from the face of § 2651(a) that Congress decided not to create a new substantive tort liability as the government had attempted in *Standard Oil,* but rather approved a remedy based upon subrogation to the injured person's (medical care recipient's) tort claim against a "third person" to the extent of the value of the care provided by the government.[17] In any case, it will be immediately seen that the Act does not purport to address specifically the benefits payable to, or on behalf of, servicemen under Chapter 55 (10 U.S.C. § 1071 *et seq.*), but rather, is to apply "In any case" in which the United States is authorized, or required, to furnish treatment, excepting only certain instances of benefits to merchant seamen and veterans (42 U.S.C. § 2651(a) and (c)). The very breadth of the Act's coverage demonstrates that Congress did not take into account the underlying legislation pursuant to which those benefits were granted, and therefore did not act with the design or purpose to limit or repeal any existing grant of benefits to any beneficiary. This conclusion is reinforced by the purpose of the legislation as stated in the Report of the Senate Judiciary Committee:

> The purpose of the proposed legislation is to provide for the recovery by the United States from negligent third persons for the cost of hospital, medical, surgical, or dental care and treatment furnished by the United States, pursuant to authority or requirement of law, to a person who is injured or suffers a disease under circumstances creating a tort liability upon such third person.

1962 U.S.Code Cong. & Admin.News 2637.[18]

The construction which the government seeks to place on the term "third person" in this case operates to deprive Col. Allen of the unqualified benefit conferred upon him under Chapter 55—to be relieved of the financial burden of providing medical care to his dependent wife—and convert it into a conditional benefit, which would thrust back upon him the full cost of such care if he is found to be negligent.[19] To

---

17. As discussed below, the government puts forward the view that its claim has nothing to do with subrogation, that "Congress has displaced common law subrogation principles." Gov't. Supp.Br. p. 2 (Dkt. #45). A number of courts have struggled with the language of the statute, and its express reference to subrogation, in the context of efforts of defendants to assert defenses based upon state law. See *United States v. Fort Benning Rifle and Pistol Club,* 387 F.2d 884 (5th Cir.1967) (effect of state statute of limitation upon the government's claim); *United States v. Moore,* 469 F.2d 788 (3d Cir.1972) (effect of state family and inter-spousal immunity laws); *United States v. Merrigan,* 389 F.2d 21 (3rd Cir.1968) (effect of prior judgment by victim against tortfeasor); *United States v. Housing Authority of the City of Bremerton,* 415 F.2d 239 (9th Cir.1969) (effect of state law limiting tort claim for medical payments to parents of infant victim). Generally speaking, the effect of these decisions has been to bar state procedural defenses but to recognize state substantive defenses. None of the cases, however, address, or even recognize the existence of, the issues under discussion here. The Act is also the subject of a frequently cited law review article by an attorney in the Department of Health, Education and Welfare. Bernzweig: *Public Law 87–693: An Analysis and Interpretation of the Federal Medi-*

*cal Care Recovery Act,* 64 Columbia L.Rev. 1257, 1261 (1964).

18. Under § 2653 of the Act "any *other* provision of law providing for *recovery* by the United States" was left in place. [emphasis added]

19. It could be argued that since Barbara's bills have been paid, the government has fulfilled the letter of its obligation to both Col. Allen and his wife under Chapter 55. The flaw in such an argument is that it requires one to ignore the fact and effect of the attempted recovery from Col. Allen. To reimpose the obligation after the fact would be hard to distinguish from denying it in the first instance—a sort of Catch–22. It is true that the government may not always be able to collect, and, indeed, may not always choose to seek recovery. But those considerations are not relevant to the question of the government's right to recover.

In that same vein, it should be reemphasized that it matters not at all whether Col. Allen has liability insurance. The FMCRA does not condition the government's right of recovery upon the wealth or poverty of the "third person," and liability insurance is nothing more than an asset or source of funds with which to discharge a judgment upon a determination of the insured's

indulge the government's position would operate, in effect, to amend, or partially repeal, this aspect of Chapter 55 in the face of the "cardinal rule ... that repeals by implication are not favored" in the absence of some clear expression of Congressional intent to do so. *Morton v. Mancari,* 417 U.S. 535, 549, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (intention must be clear and manifest); *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981); *Erlenbaugh v. United States,* 409 U.S. 239, 247, 93 S.Ct. 477, 482, 34 L.Ed.2d 446 (1972). As discussed above, nothing in the language of FMCRA or its legislative history specifically refers to Chapter 55 or to any other statute authorizing medical benefits. The FMCRA is a statute of general application that purports to deal with government medical expense recoveries in all contexts from "third persons." It has nothing to do with the granting, diminution or denial of benefits.

The present case is somewhat like *Morton.* There the question presented was whether 1934 legislation granting Indians an employment preference controverted the anti-discrimination provisions of the Equal Employment Opportunities Act of 1972. As in the instant case, there was no mention of Indian preference in the later legislation or the legislative history. More to the point, however, is the emphasis placed upon the distinction between general and specific legislation:

> Furthermore, the Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment. [citations omitted]

*Morton v. Mancari,* 417 U.S. at 550–551, 94 S.Ct. 2482–2483. This distinction is, I think, of even greater importance in this case because of the disparate purposes of the two pieces of legislation. The purpose of the specific legislation (Chapter 55) is to provide for the national defense by assuring that servicepersons and their dependents would have medical care at government expense. The FMCRA's purpose is fiscal, to restore the treasury. Certainly there was nothing about the latter act from which a purpose to reduce existing military medical benefits could be reasonably inferred. Given the dissimilarity of policy concerns addressed by the two pieces of legislation, it seems certain that if Congress had intended to "carve a substantial slice" out of the military's medical benefit structure, it would have at least mentioned it. *Erlenbaugh v. United States,* 409 U.S. at 247, 93 S.Ct. at 482; *Watt v. Alaska,* 451 U.S. at 271, 101 S.Ct. at 1680; *United States v. American Trucking Assn's,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940).

Finally, the Supreme Court decisions teach that a construction must be sought which will harmonize and reconcile the conflict so as to give meaning and effect to each statute. *Watt,* 451 U.S. at 267, 101 S.Ct. at 1678; *Morton,* 417 U.S. at 551, 94 S.Ct. at 2483. The issue reduces itself to the meaning to be assigned the term "third persons" in § 2651(a). To my mind, the inference is inescapable that Congress did not intend that term to include a member of the uniformed services whose negligence caused the injury of his/her dependent. The more reasonable meaning of the term, I suggest, is captured in the reference in the *Standard Oil* case to "strangers" to the government-soldier relation. Neither the *Standard Oil* case nor anything in the

---

liability. It is beyond the scope of this opinion to consider whether, or to what extent, Congress might fashion a remedy which would permit the government to reach a member's liability coverage in circumstances such as these. I do note, however, that Congress has adopted legislation specifically addressed to that question in connection with Medicare and could presumably introduce similar modifications into Chapter 55. (See 42 U.S.C. § 1395y(b).) In the present case

the government seems to seek to accomplish the same result without having first obtained the blessing of Congress. Of course, if the government's right to recover were sustained here, the member's need for liability insurance is clearly indicated, since a neglected home repair, a failure to supervise a child, or a carelessly tossed baseball could all result in a government suit for reimbursement.

legislative record intimates that the beneficiaries of the various programs were abusing their privileges, or being unjustly enriched, or were to be targeted for remedial legislation. Indeed, that fact that the FMCRA makes *no provision* for recovery from the recipient of the medical care (the "injured person") under any circumstances entirely negates any such motivating influence.

This leads me to the conclusion that the term third person does not, and was not intended to, include a person for whose benefit the medical care was provided—here, Col. Allen, the sponsor/member.[20] This result most closely conforms to the policy underlying Chapter 55 and its sole, expressed purpose "to create and maintain high morale" in the uniformed services. The position the government takes in this litigation is not only contrary to that policy, but plainly so. Indeed, a member of the uniformed services might well view it as a breach of faith even to suggest that the "federal programs which help the general welfare" should be subsidized out of the very pockets of the persons this program was designed to benefit.[21] Such a result is "plainly at variance with the policy of the legislation as a whole" and must be rejected. *United States v. American Trucking Ass'n*, 310 U.S. at 542–543, 60 S.Ct. at 1063–1064. It will therefore be recommended that the motion for summary judgment be denied.

This conclusion may also be sustained on the independent ground that the United States may not, under the principles of subrogation, proceed against Col. Allen. Writing in *United States v. Greene*, 266 F.Supp. 976 (N.D.Ill.1967) Judge Will succinctly explained the application of the concept of subrogation:

"Subrogation" is a term of legal art which we assume would not be employed by the drafters of the statute unless they intended it to be construed in its normal sense. In legal context, subrogation is a derivative right held by one who, while under a legal or equitable obligation to another person, pays that person a debt owed by a third party. The right of the payor (subrogee) to seek reimbursement from the third party debtor is derived from, and generally dependent on, the existence of a right in the payee (subrogor) against the debtor [footnote omitted] If the payee collects from the debtor, the payor may get a refund from the payee. If, however, the payee fails to demand satisfaction from the debtor, the payor may assert the right of the payee against the debtor. The payor (subrogee), in seeking reimbursement from the third party debtor is subject to any defenses, procedural or substantive, which the third party debtor may have had against the payee (subrogor). [footnote omitted] These defenses are available against the subrogee because he is merely asserting the subrogor's cause of action; he "stands in the shoes" of the subrogor.

266 F.Supp. at 979.

 The equitable principle of subrogation is based upon the evidence of the

---

**20.** This obviously is not intended to imply that the government's claim is barred in the case where soldier A has negligently injured soldier B or soldier B's dependents, since the military's obligation to provide medical benefits to B or his dependents does not derive from any obligation to soldier A.

**21.** The government's construction would also impose upon the member the unwanted task and the onerous expense and difficulty of defending himself/herself in litigation with his/her sovereign. The Supreme Court has spoken of such engagements with disfavor.

A soldier is at peculiar disadvantage in litigation. [footnote omitted] Lack of time and money, the difficulty if not impossibility of procuring witnesses, are only a few of the factors working to his disadvantage.
*Feres v. United States,* 340 U.S. 135, 145, 71 S.Ct. 153, 158–159, 95 L.Ed. 152 (1950); a circumstances which would seem also to be disruptive of discipline and morale.

Moreover, military discipline involves not only obedience to orders, but more generally duty and loyalty to one's service and to one's country. Suits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word.
*United States v. Johnson,* — U.S. ——, 107 S.Ct. 2063, 2069, 95 L.Ed.2d 648 (1987).

unjust enrichment of the third party debtor, in Judge Will's explanation, at the expense of the subrogee.[22] Subrogation is not automatic, however, but arises only if it is *unjust* for the third party debtor to retain the benefit.[23] Applied to the facts before the court, the case for subrogation may be stated as follows: The government has discharged an obligation (Barbara Allen's medical care) owed to her by Col. Allen by virtue of his negligence. If this results in Col. Allen's unjust enrichment, as between him and the government, then the government is subrogated (partially) to the rights Barbara has against Col. Allen. The focus then becomes whether the equities favor the United States or Col. Allen. For the reasons I have already discussed at length above, I am satisfied that the equities favor Col. Allen, and that, as between Col. Allen and the government, he will not be unjustly enriched if the government is denied subrogation. To reiterate, the government had an unconditional duty to Col. Allen, as a member of the uniformed services, to provide medical care to his dependent. If the government be permitted to recover, it would be unjustly enriched, since it would have avoided its financial obligation to Col. Allen by casting back upon him the cost of his dependent's care.

The foregoing principle appears in somewhat different form in the familiar rule of insurance cases that no subrogation may be had against one's own insured.[24] In inviting the parties' further discussion of this issue, I had not intended to suggest that the medical coverage in issue was insurance or that "insurance law" applied. The fact is, however, that the business of insuring is, by its very nature, extensively and intimately involved with subrogation (See R. Keeton, Insurance Law, Basic Text § 3.10) and the application of the principles are most often found expressed in that context.[25]

---

**22.** Restatement of Restitution, § 162, Subrogation:

> Where property of one person is used in discharging an obligation owed by another ... under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee....

Comment A to § 162 explains,

> A court of equity may give restitution to the plaintiff and prevent the unjust enrichment of the defendant, where the plaintiff's property has been used in discharging an obligation owed by the defendant ... by creating in the plaintiff rights similar to those which the obligee ... had before the obligation ... was discharged. In such a case the procedure is called subrogation, and the plaintiff is said to be subrogated to the position of the obligee....

**23.** As Comment C to Restatement of Restitution § 1, Unjust Enrichment, explains:

> Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, *as between the two persons,* it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. [emphasis added]

For an application of this rule, see *First National Bank of Columbus v. Hansen,* 84 Wis.2d 422, 431, 267 N.W.2d 367 (1978):

> A fidelity insurer will not be subrogated to the rights of its insured unless the equities in favor of the fidelity insurer are *greater* than those of the person against whom subrogation is invoked. *Liberty Mut. Ins. Co. v. Kleinman,* 149 Cal.App.2d 404, 308 P.2d 347, 348 (1957); see generally, Annot., 95 ALR 271 (1935). We hold that the balance of equities in this case will not permit the fidelity insurer to be subrogated to the insured's claim of negligence against its own officers and directors. [emphasis added]

**24.** This rule is discussed in *Stafford Metal Works, Inc. v. Cook Paint & Varnish Co.,* 418 F.Supp. 56 (N.D.Tex.1976).

**25.** If X insures his house against fire loss and pays the premium, X is not unjustly enriched if the company is required to pay the loss, even though X's negligence may have been the cause. Loss due to negligence from all sources is a risk insured against (unless the policy says otherwise) and for which X paid. No one is enriched unjustly if the company is simply required to perform its part of the bargain and X receives that which he was to receive under the contract. By contrast, if X were required to respond to the insurance company in damages for his negligence, he would be denied the contract benefits he had paid for and the company would be enriched by being excused from its obligation to pay for the loss. Unfortunately, this example is not purely theoretical. Frequently an incentive for the insurer to attempt to assert subrogation rights against X is found in the fact that X has liability insurance and would not himself be bearing the loss if subrogation recovery were allowed. This distorting effect of liability insurance is, to some extent, also present in this case.

I am mindful of the government's contention that its case has nothing to do with subrogation and is grounded upon what it chooses to call "an independent right of recovery." I do not intend to prolong this opinion unnecessarily in the consideration of that question. Like most of the cases to which it refers, the government has offered no explanation of the substance or dimensions of that independent right of recovery. Nor has it offered any explanation for the presence of the word "subrogated" in § 2651(a), or the canon of construction that would permit the word, and the baggage it carries, to be ignored. We are invited instead to disregard the language in the legislative history which might be instructive on the nature of the government's claim [26] and fasten on the "somewhat enigmatic statements which purport to interpret the purpose" of an amendment which changed the original language of § 2651(a), which read in pertinent part:

> ... the United States shall be subrogated to any right or claim ... to read

**26.** As the then Deputy Attorney General (now Justice) Byron White stated, writing in support of the proposed legislation:
> It was, therefore, considered preferable to bottom the basic theory of this legislation on the subrogation concept, one which is universally recognized, understood, and regularly applied by all courts, and which would more closely conform the rights of the United States, and the procedure for their enforcement, through the local law and practice, whatever it might be.

1962 U.S.Code Cong. & Admin.News, p. 2644.

**27.** *United States v. Greene,* 266 F.Supp. at 978. The language of the original bill and the amendments may be found at H.R. 298, 87th Cong., 1st Sess., 108 Cong.Rec. 1669–70 (1961). Referring to the amendment, the House Report (H.R.Rep. No. 1534, 87th Cong., 2d Sess. 1 (1962)) states:
> By striking out the reference to subrogation or assignment, the distinct right in the Government along with the equally distinct rights of the individual are again emphasized. It is clear that independent rights of recovery exist and, except as limited in this subsection, their exercise is not conditioned upon action by the Government or the individual.
> The amendments are ... intended to make it clear that a specific right is recognized on the part of the Government to recover tortiously [sic] liable third persons. It is intended that his right would be exercised without affecting

... The United States shall *have a right to recover from said third person the reasonable value of the care and treatment so furnished or to be furnished and shall, as to this right* be subrogated to any right or claim ... [27]

I am not persuaded by the government's argument, nor is it supported by the Bernzweig article to which the government looks for its primary authority.[28] To be sure, the amendment removes any doubt about the standing of the United States to sue and recover in its own behalf, apart from any action the injured party may elect to bring, but neither the language of the statute nor the legislative history afford any warrant for the contention that an independent cause of action (such as the government had in mind in *Standard Oil*) unrelated to subrogation was created.

Even Mr. Bernzweig's outspoken advocacy of the independent action theory concedes the centrality of subrogation.[29] He describes the government's remedies as follows:

> the rights of that individual to recover for losses and damages peculiar to him and in which the Government has no direct interests.
> *Id.* at 2.
> This amendment makes it clear that the United States is granted a distinct right to recover its costs and that this right is to be effectuated through a partial subrogation to any right which the injured or diseased person may have to proceed against the negligent third party.
> *Id.* at 3
> Again, by striking out the words "subrogation or assignment" and inserting the words referring to the right established in section (1), it is again emphasized that the remedy of the Government to assert its rights to recover the cost and surgical services is provided by this legislation.
> *Id.* at 4.

**28.** See note 17, *supra* p. 1252.

**29.** In the conclusion to his article he acknowledges that while the FMCRA confers "an independent, federal right of recovery on the United States, it requires that the right be vindicated by subrogation and assignment—devices that under existing standards would expose that right to the vagaries of a multitude of differing local qualifications." 64 Col.Law Rev. at p. 1272. This seems very close to what Dep. Attorney General White had in mind. See n. 26, *supra.*

Congress provided the United States with two remedies for enforcing its right to recover claims under the Act: partial subrogation and partial assignment. Legal subrogation, originally a creature of equity derived from the doctrine of unjust enrichment, places the government in the role of any other subrogee to the extent that its claim is contingent upon the rights of the injured beneficiary. As a general proposition, this means that the government cannot acquire greater rights through subrogation than the injured beneficiary possesses under local tort law. [footnotes omitted]

For these reasons I reject the government's argument that the principles of subrogation do not apply to its claim against Col. Allen.[30] Finding that they do apply, I further conclude that it would offend those principles to permit the action to be maintained.

## 2. *Priority*

■ Even if I were to conclude that the government is entitled to reimbursement under the Act, summary judgment would still be inappropriate because the government has failed to establish its priority to the USAA policy proceeds. The government asserts priority under 31 U.S.C. § 3713(a)(1)(A)(i), which pertains to government claims generally. It states:

§ 3713. **Priority of Government claims**

(a)(1) A claim of the United States Government shall be paid first when—

(A) a person indebted to the Government is insolvent and—

(i) the debtor without enough property to pay all debts makes a voluntary assignment of property....

The government contends that if the claims arising out of the accident exceed the USAA policy limits, USAA is an "insolvent" party as referenced in § 3713 (Gov't Reply Br., Dkt. # 40, pp. 5–6).[31]

There is no basis for the government's position. USAA is not the debtor in this case. Col. Allen is, and it is to his solvency (actually, his estate's) to which the statute applies. Yet the government has made no claim against his estate, and has failed even to assert, let alone demonstrate, that the estate is insolvent. USAA, by contrast, simply holds, or held, an asset of the estate. It is Col. Allen's indemnitor up to the maximums stipulated in the policy. Far from being unable to discharge its obligation, USAA has paid its obligation in full by depositing it with the Clerk of Court.

■ There is another flaw in the government's contention. The FMCRA itself speaks to the priority issue. Section 2652(c) of the Act provides as follows:

*Damages recoverable for personal injury unaffected*

*No action* taken by the United States in connection with the rights afforded under this legislation *shall operate to deny* to the injured person the *recovery* for that portion of his damage not covered hereunder. [emphasis added]

Subsection (c) was not part of the original bill. The purpose of adding the provision, according to the House Committee Report, was to make clear Congress' intent that the government's right under the Act "would be exercised without affecting the rights of that individual [the victim] to recover for losses and damages peculiar to him and in which the Government has no direct interests." H.R.Rep. No. 1534, 87th Cong., 2d Sess. 2 (1962). See also S.Rep. No. 1945,

---

**30.** Some mention should be made of the seemingly conflicting result in *United States v. Greene,* 266 F.Supp. 976. There Judge Will held that the government could maintain a direct claim for the medical care because there was no subrogation claim. He reasoned (apparently applying Illinois law) that since the victim (the putative subrogor) was not liable to the government for the care he received, he could not recover the value of that care from the tortfeasor. Accordingly, the government had no subrogated rights to enforce. That result would

not obtain in Wisconsin in light of *Rixmann v. Somerset Public Schools,* 83 Wis.2d 571, 266 N.W.2d 326 (1978) which affirms a tort plaintiff's right to recover the value of all medical expenses, including those provided gratuitously by the government.

**31.** For the reasons stated *supra* p. 1246, I have assumed that the claims do exceed the policy limits.

87th Cong., 2d Sess., *reprinted in* 1962 U.S.Code Cong. & Admin.News 2637, 2642 (government's right shall not impair right of injured person to recover damages other than cost of medical care furnished by government).

In light of the language of the statute and its legislative history, I am persuaded that § 2652(c) requires that the injured party be made whole before the government may be reimbursed under the Act.[32] The language of the statute is unequivocal: "No action ... shall operate to deny ... recovery ..." It is difficult to see how the recognition of a government priority, or even a pro rata participation, can be considered anything other than a denial of recovery. Thus, under my reading, the statute appears to afford the injured person priority should the tortfeasor be unable to satisfy both of their claims.

This construction of § 2652(a) also conforms to the prevailing subrogation rule, recognized in Wisconsin, that the subrogee is entitled to *no* recovery until the subrogor has been made whole; i.e. compensated in full by the tortfeasor. See *Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis.2d 263, 316 N.W.2d 348 (1982); *Garrity v. Rural Mut. Ins. Co.*, 77 Wis.2d 537, 253 N.W.2d 512 (1977).[33]

The government argues that § 2652(c) does nothing more than declare that the Act does not impair an injured person's right to sue and obtain a judgment against the tortfeasor. However, none of the cases it cites for that proposition undertook to construe § 2652(c) and the construction

urged is illogical in any event. The focus of the subsection is clearly upon the scope and effect of the *government's* actions. There is nothing to suggest that the Act impedes an injured party's rights vis-a-vis the tortfeasor and, consequently, there was no need for Congress to clarify its position on that issue. On the other hand, having created a right to recovery in the government, it seems reasonable that Congress would take up the priority question. What is more, the plain language of the statute— that the Act shall not impair the injured party's right to recovery "for that portion of his damage not covered hereunder"—describes the *extent* of the injured party's recovery. The underlying right of recovery is assumed.

[9] Finally, it is urged by the government that § 2652(c) does not apply here because plaintiffs are not "injured persons" under the statute. That is true as to Katherine Allen,[34] but I find rather remarkable the government's contention that Barbara Allen's estate should not recover because she is dead and no longer has any need to recover damages. Under Wisconsin law, Barbara Allen's claim for her conscious pain and suffering survives her death, and may be brought by her personal representative. Wis.Stat. §§ 895.03 and 895.04. Thus, Barbara's estate, like Barbara herself, is an injured person under § 2652(c).

For these reasons, I conclude that even if the government had a claim under the Act, it would not be entitled to priority and a

---

**32.** The parties have not cited, and I have been unable to locate, any cases that have directly considered this question. But see *United States v. Merrigan*, 389 F.2d 21, 24 (3rd Cir.1968) (observing, in dictum, that it is "clear beyond question that it is not to be read as limiting in any manner the rights of the injured person against the tortfeasor.")

**33.** I have examined the Wisconsin authorities cited by the government in this regard and they are inapposite. For example, the government cites *Coplien v. Department of Health and Soc. Serv.*, 119 Wis.2d 52, 349 N.W.2d 92 (Ct.App. 1984) and *Waukesha Cty. v. Johnson*, 107 Wis.2d 155, 320 N.W.2d 1 (Ct.App.1982) for the proposition that the FMCRA displaced the common law subrogation principle that injured parties be

made whole. Neither of these cases, however, involved the FMCRA. Moreover, in those cases the state of Wisconsin's right to be reimbursed for medical assistance payments before the injured party was fully compensated was based on a state statute (Wis.Stat. § 49.65(4)) that specifically granted priority to the government. No such provision exists in this case. In fact, as explained above, § 2652(c) appears to confer priority upon the injured party.

**34.** A dependent child may receive damages for loss of society and companionship on account of the wrongful death of a parent. Wis.Stat. § 895.04(4). This claim is independent of any claim Barbara Allen may have had an § 2652(c) affords it no priority.

trial would be necessary to establish the validity and amount of each of the claimant's claims. It is unnecessary to consider here how the liability insurance proceeds should be distributed in the event that the aggregate amount of the claims exceeds the amount held by the Clerk.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 U.S.C. § 636(b)(1)(B), that the district court deny the motion of the United States for summary judgment.